Filed 6/14/17 Umodified version attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| CALIFORNIA FAIR PLAN ASSOCIATION,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARLENE GARNES,<br><br>    Defendant and Appellant. | A143190<br><br>(Contra Costa County<br>Super. Ct. No. C1102417)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on May 26, 2017, be modified as follows:

On page 34, at the end of the first partial paragraph, following the citation to "*Wildman*, *supra*, 48 Cal.2d at pp. 39–40 [where policy provisions were in derogation of Vehicle Code sections, latter "must be considered a part of every policy of liability insurance even though the policy itself does not specifically make such laws a part thereof"];" insert:

***Gebers v. State Farm General Ins. Co.* (1995) 38 Cal.App.4th 1648, 1651 ["Changes or variations to the standard form may not reduce the insurer's obligations"];**

This modification does not effect a change in the judgment.

The petition for rehearing is denied.

Dated:_____                    _____
                                              RICHMAN, Acting P.J.

1

Trial Court:   Contra Costa County Superior Court

Trial Judge:   Hon. Steven Austin

Counsel:

Hereford Kerley, Law Office of Dylan Schaffer, Kerley Schaffer, J. Edward Kerley, Dylan L. Schaffer for Defendant and Appellant.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Chief Assistant Attorney General, Paul D. Gifford, Senior Assistant Attorney General, Joyce E. Hee, Supervising Deputy Attorney General, Robert E. Asperger, Deputy Attorney General for Dave Jones, Insurance Commissioner of the State of California as Amicus Curiae on behalf of Defendant and Appellant.

Amy Bach, Daniel Wade for United Policyholders as Amicus Curiae on behalf of Defendant and Appellant.

Lewis Brisbois Bisgaard & Smith, Raul L. Martinez, Elise D. Klein for Plaintiff and Respondent.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CALIFORNIA FAIR PLAN ASSOCIATION,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MARLENE GARNES,<br><br>     Defendant and Appellant. | A143190<br><br>(Contra Costa County<br>Super. Ct. No. C1102417) |

In 2011, Marlene Garnes's family home in Richmond, California was seriously damaged by a kitchen fire. She had purchased a fire insurance policy for the property, with a policy limit of $425,000 (the Policy), from California FAIR Plan Association (FAIR), California's insurer of last resort. The dispute in this case and the issue on appeal is how much coverage Garnes is entitled to under the Policy. She claims she should receive the amount it will cost her to repair the house, less an amount for depreciation, the net amount of which the parties agree would be $320,549. FAIR contends the Policy, and the Insurance Code, allow it to pay her the lesser of that amount or the fair market value of the house, which at the time of the fire was $75,000. The answer to this question depends on interpretation of sections 2051, 2070 and 2071 of the Insurance Code,[1] including the phrases "total loss to the structure," "partial loss to the structure" and "actual cash value" in section 2051, and whether sections 2070 and 2071 permit insurers to provide less favorable coverage than that prescribed by section 2051. Applying our independent judgment to these questions of statutory interpretation, we

---

[1] All further statutory references are to the Insurance Code, unless otherwise indicated.

1

conclude that Garnes is correct. Section 2051 of the Insurance Code provides that under an open fire insurance policy that pays "actual cash value," as does the Policy here, the "measure of the actual cash value recovery . . . shall be determined" in one of two ways, depending on whether there has been a "total loss to the structure" or a "partial loss to the structure." For a "partial loss to the structure," the measure prescribed is "the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured less a fair and reasonable deduction for physical depreciation" or "the policy limit, whichever is less." (§ 2051, subd. (b)(2).) Construed in accord with its plain meaning, this provision, coupled with sections 2070 and 2071, sets a minimum standard of coverage that requires FAIR to indemnify Garnes for the actual cost of the repair to her home, minus depreciation, even if this amount exceeds the fair market value of her home. Further, the legislative history and the Insurance Commissioner's interpretation of this statute also support this interpretation. FAIR's arguments are based on interpretations of these sections that cannot be squared with their plain language, and the contention that requiring recovery of repair costs less depreciation where they exceed fair market value is bad policy. The latter argument is for the Legislature, not this court. The law supports Garnes's interpretation. Therefore, we reverse the trial court's judgment and remand this matter for further proceedings consistent with this opinion.

## BACKGROUND

FAIR is an insurance industry placement facility and joint reinsurance association created by the Legislature in 1968 to ensure that homeowners who live in high risk or otherwise uninsurable areas have access to basic property insurance. (*St. Cyr v. California FAIR Plan Assn.* (2014) 223 Cal.App.4th 786, 792–793; §§ 10090–10091.) It is composed of insurers licensed to write and engaged in writing basic property insurance within this state, and it is charged with assisting persons in securing basic property insurance and administering a program to equitably apportion that insurance, and the risks and benefits it entails, among California insurers. (§§ 10091, subd. (a), 10094.)

In October 2011, Garnes's home in the Iron Triangle neighborhood in Richmond was damaged by a fire. She submitted a claim to her insurer, FAIR, seeking indemnity

for the costs required to repair her home, less depreciation. FAIR declined to pay the amount she requested and instead paid her the $75,000 it determined represented the fair market value of her property in 2011. When the parties were unable to agree, FAIR filed an action against Garnes[2] seeking declaratory relief regarding the interpretation of section 2051. FAIR alleged it had issued Garnes a policy that covered the damage to her home, that the cost to repair and rebuild the home was estimated to be more than $350,000 and that the home's fair market value in its undamaged condition before the fire was $75,000. It further alleged that Garnes claimed she was entitled to the cost to repair her home, that FAIR had paid her the fair market value of $75,000 for her home[3] and that the parties disputed whether the damage resulted in a total loss or a partial loss within the meaning of section 2051. FAIR contended the loss was total because the cost to repair exceeded the home's fair market value, and that Garnes was entitled only to the fair market value of the home under section 2051. According to FAIR, Garnes contended she suffered only partial loss, which entitled her under section 2051 to recover the lesser of the policy limit and the cost to repair or replace less depreciation. FAIR sought a declaration that damage to Garnes's home constituted a total loss within the meaning of the Policy and section 2051 and that Garnes, therefore, was entitled only to the actual cash value, meaning fair market value, of her Richmond home.

Garnes filed an answer contesting FAIR's interpretation of section 2051 and alleging that the Policy, as written, violates sections 2051, 2070, 2071, 10091 and 10094. She sought a declaration that "total loss" under section 2051 means total loss to the structure and that FAIR was violating its statutory obligations. She also filed a cross-complaint against FAIR asserting claims for breach of contract and the covenant of good faith and fair dealing; FAIR filed an answer denying her allegations.

---

[2] The suit also named Garnes's husband, Johnie Garnes, who is now deceased.

[3] FAIR also alleged it had paid her separate amounts totaling about $67,000 for demolition, asbestos abatement, emergency board up and lost rental value. Those amounts are not in dispute.

In August 2012, FAIR filed a motion for summary judgment on its complaint against Garnes. It argued that the Policy limits Garnes to the actual cash value of the home where the cost to repair the damage exceeds the home's fair market value, and that the Policy complies with sections 2051 and 2071.

FAIR based its motion on a handful of undisputed facts. These included that FAIR issued the Policy providing coverage for Garnes's dwelling, that the dwelling was damaged by fire within the policy period, that Garnes submitted a claim for the cost of repairing the damage, less depreciation, of $320,549.24, and that the appraised fair market value of the home before the fire was determined to be $75,000. FAIR also set forth the relevant terms of the Policy, which stated that if the cost to replace or repair a damaged dwelling exceeded its actual cash value, which the Policy referred to as "Total Loss," FAIR would pay the actual cash value, but in any other case, which the Policy described as "Partial Loss," FAIR would pay the lesser of the cost to repair less reasonable depreciation or the actual cash value.

In opposition to FAIR's motion, Garnes offered the following additional facts: The Policy has a limit of $425,000, Garnes's father purchased the Richmond home in the 1950s, it was Garnes's childhood home and Garnes intended to repair and move back into it, but FAIR had refused to pay an amount sufficient to repair it. Garnes also stated that FAIR never changed its policy form to comply with the amendments to section 2051 enacted by the Legislature in 2004, despite having been warned by the Insurance Commissioner, and had refused to pay her the amount required by section 2051, subdivision (b).

Garnes contended that the 2004 amendments to section 2051 were part of the Homeowners' Bill of Rights, which was designed to protect consumers of insurance who suffer loss of homes or other structures, that the bill required insurers to amend their policies to comply with section 2051 by July 1, 2005, and that FAIR did not amend its policies. She argued that the Policy, by seeking to limit recovery for partial losses to fair market value, was "in clear contradiction with section 2051." She further argued that the

4

court should look to the Insurance Code, not the Policy, to determine the extent of FAIR's liability for her fire loss.

In a one-page tentative ruling that it subsequently adopted as its order, the trial court granted FAIR's motion for summary judgment, adopting FAIR's interpretation of the statutes. The parties thereafter stipulated to certain rulings that resolved the remaining issues, and the court entered judgment in favor of FAIR on all claims.

This appeal followed. After the parties submitted their briefs, we received and granted requests to file amicus curiae briefs from the Insurance Commissioner (Commissioner), who is charged with enforcing the Insurance Code and other laws regulating the business of insurance in this state (§§ 12906, 12921), and from United Policyholders, a national non-profit organization that seeks to promote and protect the interests of insurance consumers.[4]

---

[4] The parties and the Commissioner have also submitted various requests for judicial notice, some of which we now rule upon. On July 15, 2015, Garnes submitted a request for judicial notice of certain correspondence from counsel for the Commissioner to counsel for FAIR, which FAIR opposed. We deny this request as untimely, having been filed after FAIR had filed its respondent's brief. (See Evid. Code, § 453, subd. (a).) On August 19, 2015, the Commissioner submitted a request for judicial notice of five items. We grant the request for the first three items, but deny it as to the two letters from the Commissioner's counsel to FAIR's counsel in 2014 and 2015 because, as FAIR points out in its brief in response to the Commissioner's amicus brief, these letters pertain to an argument—that FAIR's policy is unenforceable because FAIR did not seek or obtain the Commissioner's permission to use it—that was not raised in the parties' briefs on appeal. (*Mercury Casualty Co. v. Hertz Corp.* (1997) 59 Cal.App.4th 414, 424–425 [" 'As a general rule, issues not raised by the appealing parties may not be considered if raised for the first time by amici curiae' "].) Further, to the extent the letters also reflect the Commissioner's interpretation of the statute, they are redundant of the Commissioner's view as stated in his brief. We also deny FAIR's subsequent request for judicial notice of materials related to this argument of the Commissioner that we have declined to consider. (See *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2 [that judicially noticed material be relevant to a material issue is a precondition to the taking of judicial notice].)

## DISCUSSION

The facts here are not in dispute. The parties agree that Garnes purchased from FAIR an insurance policy with a limit of $425,000[5] covering fire damage to her Richmond home for the period from December 23, 2010, to December 23, 2011. A kitchen fire occurred on January 1, 2011, within the policy period, that caused substantial damage to her home. The cost to repair the damage, including necessary lead and asbestos abatement, was $362,670. Subtracting depreciation, the public adjuster submitted a claim to FAIR on Garnes's behalf for $320,549. FAIR obtained an appraisal to determine the fair market value of the home in its undamaged condition just prior to the fire, which was determined to be $75,000.

It is also undisputed that the Policy FAIR issued to Garnes is a fire insurance policy of a kind known as an "open policy," meaning "one in which the value of the subject matter is not agreed upon, but is left to be ascertained in case of loss." (§ 411.)[6] Further, it is an "actual cash value" or "ACV" policy. In a section entitled "CONDITIONS," the Policy contains a paragraph entitled "Loss Settlement," which states in relevant part that FAIR will pay the following amounts for losses to Garnes's dwelling: "(1) Total Loss: If the greater of the cost either to reconstruct or replace the damaged part of the property exceeds the actual cash value before the loss of all covered property . . . , we will pay such actual cash value. [¶] (2) Partial Loss: In the cases of losses that are not described in (1) above, we will pay the least of the following amounts: [¶] (a) The lower of the cost either to reconstruct or replace the damaged part of the property, less a reasonable amount for depreciation; or [¶] (b) The actual cash value

---

[5] The Policy insures the dwelling for $425,000 and personal property for $50,000.

[6] This is to be distinguished from a "valued policy," which is one that "expresses on its face an agreement that the thing insured shall be valued at a specified sum." (§ 412.) As FAIR points out in its brief, the coverage amounts of $425,000 for the home and $50,000 for its contents were requested by Garnes and not based on any inspection or valuation assessment by FAIR.

6

before the loss of the damaged property." The Policy defines "actual cash value" of property to mean "its fair market value."

At the crux of this appeal are two legal issues, which we review de novo. (*Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1393–1394 ["The de novo standard of review applies to issues of statutory and insurance policy interpretation"].) First, do the relevant provisions of the Insurance Code, sections 2051, 2070 and 2071, which govern open ACV policies, require FAIR to provide coverage to Garnes to pay for the repair of the damage to her home, minus depreciation, if this amount exceeds the fair market value of her home, as Garnes contends, or are these statutes consistent with the Policy, which categorizes any loss in which cost to repair exceeds actual cash value as a "total loss" entitling the policy holder to, at most, the fair market value of her property, as FAIR contends?[7] Second, if these statutes and the Policy conflict, which governs the parties' relationship here, the statutes, as Garnes contends, or the Policy, as FAIR contends? We conclude Garnes is correct as a matter of law in both respects: the Insurance Code require**s** payment of the costs to repair her home, less depreciation, even if this amount exceeds the fair market value of her home, and it governs over any conflicting terms of the Policy.

## I.

### *The Insurance Code Requires FAIR to Pay for the Repair of Garnes's Partially Damaged Home.*

In their dispute over what the Insurance Code requires, Garnes and FAIR principally debate two questions of statutory construction. First, does "total loss" in section 2051, mean, as FAIR contends, damage to a dwelling so extensive that the cost to repair or replace it exceeds its fair market value, or, as Garnes contends, the total physical destruction of a dwelling? Second, does "actual cash value" as used in section 2071

---

[7] The parties dispute whether Garnes's dwelling suffered a "total loss" or a "partial loss." However, their disagreement on this point is of a legal rather than a factual nature. The effect of the fire on Garnes's home is not disputed. The fire caused extensive damage to Garnes's home, but did not physically destroy the building.

mean, as FAIR contends, the fair market value of the dwelling, exclusive of the land, or, as Garnes contends, the "actual cash value" that is set forth in section 2051, which for a loss that is partial is the lesser of the cost to repair the dwelling minus depreciation and the policy limit?

We construe insurance statutes "to ascertain and effectuate legislative intent," looking first to the statutes' words. (*CalFarm Ins. Co. v. Wolf* (2001) 86 Cal.App.4th 811, 815.) "If those words are clear, there is no need for construction. ' "When the language is susceptible of more than one reasonable interpretation, however, we look to a variety of extrinsic aids," ' including the object to be achieved, the evil to be remedied, public policy, the statutory scheme of which the statute is a part, and legislative history." (*Ibid.*, fn. omitted.) Applying these principles, we have examined the statutes' plain meaning, the relevant legislative history and the Insurance Commissioner's interpretation of the statutes, and conclude that Garnes's interpretation of the statutes is correct.

### A. Section 2051 Plainly Refers to Physical, Rather than Economic "Loss."

Section 2051 sets forth the "measure of indemnity in fire insurance" for an open ACV policy. Section 2051, subdivision (a) states that an insurer's indemnity obligation under an open ACV policy is generally based on the expense of replacing lost or injured property.[8] This obligation is further explicated by subdivisions (b)(1) and (2), which prescribe mandatory measures of "actual cash value recovery" for each of two distinct situations: one that applies "[i]n case of total loss to the structure" and another that applies "[i]n case of a partial loss to the structure" or to loss of the contents.[9]

---

[8]  Section 2051, subdivision (a) states:  "Under an open policy, the measure of indemnity in fire insurance is the expense to the insured of replacing the thing lost or injured in its condition at the time of the injury, the expense being computed as of the time of the commencement of the fire."

[9]  Section 2051, subdivision (b) provides:  "Under an open policy that requires payment of actual cash value, the measure of the actual cash value recovery, in whole or partial settlement of the claim, *shall* be determined as follows:

"(1) In case of total loss to the structure, the policy limit or the fair market value of the structure, whichever is less.

In the case of a "total loss to the structure," recovery is limited to the lesser of the policy limit or a property's "fair market value." (§ 2051, subd. (b)(1).) In the case of "partial loss to the structure," however, recovery is not limited to fair market value; instead, it is the lesser of the policy limit or "the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured less a fair and reasonable deduction for physical depreciation based upon its conditions at the time of the injury." (§ 2051, subd. (b)(1).) Under subdivision (b)(2), it is clear that in the case of "partial loss to the structure," the insured is entitled to repair, rebuild or replace that which was lost or injured. While such recovery is reduced by a deduction for physical depreciation and may not exceed the policy limit, nothing in subdivision (b)(2) or the remainder of section 2051 indicates that the policyholder is limited to the fair market value of the property or any part of it.

The language of section 2051 not only specifies the meaning of "actual cash value" for total and partial losses, it provides strong indication of what constitutes a total or partial loss of a residential property—specifically, that the determination depends on what happens "to the structure." Contrary to FAIR's policy definition, which defines "total loss" and "partial loss" by reference to economic considerations (whether the cost to repair exceeds the property's fair market value), section 2051 differentiates between the degree of loss "to the structure," and it prescribes two different measures of actual cash value depending on whether the loss to the structure is "total" or "partial."

---

"(2) In case of a partial loss to the structure, or loss to its contents, the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured less a fair and reasonable deduction for physical depreciation based upon its condition at the time of the injury or the policy limit, whichever is less. In case of partial loss to the structure, a deduction for physical depreciation shall apply only to components of a structure that are normally subject to repair and replacement during the useful life of that structure." (Italics added.)

Section 16 provides that as used in the Insurance Code, "the word 'shall' is mandatory and the word 'may' is permissive, unless otherwise apparent from the context."

9

The parties cite various authorities regarding the meaning of the phrases "total loss" and "partial loss," but these authorities are of little value because they do not address the statutory language before us: "total loss to the structure" and "partial loss to the structure." Garnes cites authorities that are equivocal and indicate there are two possible meanings of "total loss"; however, these authorities do not contain language referring to "loss to the structure."[10] FAIR refers throughout its briefs to "total loss" and "partial loss" but fails to address the full phrases used in section 2051: "total loss *to the structure*" and "partial loss *to the structure*."[11]

While neither party provides any case law or other authority interpreting either "total" or "partial" "loss to the structure," we are at a loss to understand how the phrase "loss to the structure," without more, can possibly connote the economic concept FAIR urges, i.e., a loss requiring repairs that would or would not cost more than the structure's fair market value. While "loss" by itself may be physical or economic,[12] the "structure" obviously refers to a physical structure, i.e., the insured dwelling.[13] As Garnes puts it, "in the statute, the object phrase—'total loss'—operates upon the subject phrase—'a structure'—by way of the preposition 'to.' Had the Legislature used the word 'of', or used a different sort of construction, such as 'where a structure *is a total loss*', there might be some ambiguity. But total loss *to* a structure unmistakably contemplates a

---

[10] For example, she cites a definition for "total loss" in Black's Law Dictionary (7th ed. 1999) and cases discussing the meaning of this term (see, e.g., *Martinez v. Enterprise Rent-A-Car Co.* (2004) 119 Cal.App.4th 46, 54 [" 'Total loss' is commonly used to mean a 'complete destruction' of the property at issue. . . . [L]egal treatises are consistent in defining a vehicle as a 'total loss' where the cost of repairs exceeds the vehicle's precollision fair market value"].)

[11] For this same reason, its lengthy discussion of other jurisdictions' interpretations of "total loss" or "partial loss" for purposes of property insurance policies is not relevant.

[12] Merriam-Webster's first definition of "loss" is "destruction, ruin." (<https://www.merriam-webster.com/dictionary/loss>.)

[13] See <https://www.merriam-webster.com/dictionary/structure> (defining "structure" to mean, inter alia, "something (such as a building) that is constructed").

10

quantum of physical damage—i.e., complete or total—and excludes the sort of economic analysis employed by FAIR Plan."

Further, if the Legislature had intended an economic definition, it could have said so. Indeed, FAIR provided just such an explanation or definition for "total loss" in the Policy: "If the greater of the cost either to reconstruct or replace the damaged part of the property exceeds the actual cash value before the loss of all covered property . . . ." And Black's Law Dictionary defines "constructive total loss" as "[s]uch serious damage to the insured property that the cost of repairs would exceed the value of the thing repaired." (Black's Law Dictionary (8th ed. 2004) p. 964.) But the Legislature did not employ such language connoting an economic measure. Instead it employed a phrase, "loss to the structure," that connotes *physical* damage. Applying that meaning to the undisputed facts, it is apparent that the loss to Garnes's home was partial within the meaning of section 2051, as she contends, rather than total, as FAIR contends. Garnes's home was damaged, not destroyed.

Nonetheless, FAIR contends, even if the loss was partial, the outer limit of recovery allowed under the Insurance Code is the fair market value of the dwelling. While FAIR acknowledges that section 2051, subdivision (b)(2), addressing recovery in the case of a partial loss to the structure, "does not mention 'fair market value' as an outside limit," it contends section 2071 contains an "indemnity cap," i.e., that the "actual cash value" cap in that section is synonymous with the fair market value of the property, and that section 2051 "was not intended to repeal" this cap. To evaluate this argument, we must consider section 2051 together with sections 2070 and 2071.

**B. Sections 2070, 2071 and 2051 Read Together Support Garnes's View of FAIR's Statutory Obligations.**

Section 2070 generally requires fire policies in California to be on the standard form set forth in section 2071, but permits insurers to deviate from the form "provided, that coverage with respect to the peril of fire, when reviewed in its entirety, is substantially equivalent to or more favorable to the insured than that contained in such standard form fire insurance policy." (§ 2070.) FAIR appears to argue that the Policy is

11

"consistent with" the standard form, which we take to mean "substantially equivalent" to it.

The standard form as set forth in section 2071 provides, in relevant part, that in consideration for the premium, the insurer "does insure [the insured] and legal representatives, to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after the loss . . . ." (§ 2071, subd. (a).) FAIR argues this language "clearly 'caps' the limit of liability at the 'actual cash value of the property' at the time of loss." Next, FAIR relies primarily on *Jefferson Ins. Co. v. Superior Court* (1970) 3 Cal.3d 398, 402 (*Jefferson*) for the proposition that " 'actual cash value of the property' as used in section 2071, is synonymous with 'fair market value.' " "Thus," FAIR continues, "if the cost to repair or replace the damaged property is more than its fair market value, then, according to the plain language of section 2071, there is no coverage for the repair or replacement cost to the extent it exceeds the actual cash value of the property."

In *Jefferson*, the California Supreme Court addressed the meaning of "actual cash value" as used in the "average clause" of the standard form insurance policy then set forth in section 2071. The insurers sought to apply the average clause, which allowed them to proportionately reduce their coverage of fire damage to a hotel if the hotel owner had not purchased a policy insuring the building to at least 70 percent of its actual cash value.[14] (*Jefferson*, *supra*, 3 Cal.3d at p. 400.) They contended "actual cash value," as used in the "average clause" of the policy, did not mean fair market value, but meant the replacement cost of the building less depreciation. (*Id*. at p. 401.) The replacement cost

---

[14] The average clause was designed to reduce the insurer's coverage obligation if the property was substantially underinsured. (*Jefferson*, *supra*, 3 Cal.3d at p. 400.) The clause provided: "[This] company shall be liable for no greater proportion of such loss than the amount of insurance specified in such item bears to the percentage specified in the first page of this policy [70%] of *the actual cash value* of the property . . . ." (*Id*. at p. 400, fn. 1, italics added.)

12

for the hotel, less depreciation, was determined to be almost $170,000—far more than the hotel's fair market value of $65,000. (*Id*. at p. 400.) Whether the hotel was insured for 70 percent of its actual cash value depended on whether "actual cash value" was interpreted to mean replacement cost less depreciation or the hotel's fair market value. By using the higher replacement cost minus depreciation measure, the insurers sought to invoke the average clause and thereby reduce what they owed the hotel owner under the policy. (*Id*. at p. 401 [insurers sought to pay $10,154 as proportion of $24,102 loss].) The Supreme Court held that " '[a]ctual cash value,' " as used in section 2071, was "synonymous with 'fair market value' " rather than "replacement cost less depreciation." (*Jefferson*, at p. 402.)

The *Jefferson* court also sought to reconcile the use of the term "actual cash value" in the average clause with the term's use in the basic insuring clause of the policy: "The term appears not only in the average clause, . . . but also in the insuring clause and must be given the same meaning in both. The latter clause insures 'to the extent of the actual cash value of the property at the time of loss, but not exceeding the . . . cost to repair or replace the property . . . .' Since replacement cost less depreciation can *never* exceed replacement cost, it would not be logical to interpret this clause to mean 'to the extent of the replacement cost less depreciation, but not exceeding the . . . cost to repair *or replace* the property.' (Italics added.) If 'actual cash value' had been intended to mean replacement cost less depreciation, the Legislature would not have used 'the cost to . . . replace the property' as a limiting factor, and would have specified as a limiting factor only the cost to repair the property." (*Jefferson*, *supra*, 3 Cal.3d at p. 402.)

FAIR's reliance on *Jefferson* overlooks one thing: the case involved a standard form policy that was part of an earlier statutory regime. In 2004, 34 years after *Jefferson* was decided, the Legislature adopted the current version of section 2051, which prescribes the method for determining (and therefore the meaning of) "actual cash value" for purposes of determining the insurer's indemnity obligation under an open fire insurance policy. Thus, while in 1970, the *Jefferson* court interpreted "actual cash value" as used in section 2071 to mean "fair market value," in 2004 the Legislature adopted a

13

more specific and mandatory measure of "actual cash value" in a closely related section of the Insurance Code, section 2051.[15]  For a total loss, the Legislature determined "actual cash value" means the *lesser* of fair market value of the structure *or* the policy limit.  For a partial loss to the structure or loss to its contents, it means the *lesser* of the cost to repair or replace the thing lost or injured minus a reasonable deduction for physical depreciation *or* the policy limit.  (See *Kirkwood v. California State Automobile Assn. Inter-Ins. Bureau* (2011) 193 Cal.App.4th 49, 53 ["the 2004 amendments to section 2051, . . . set out the precise method of determining actual cash value of lost or injured property under an open policy of fire insurance"].)[16]  To the extent section 2051's definition of "actual cash value" differs from that in *Jefferson*, this later-enacted legislation controls.[17]  (See *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 844 [statute

---

[15]  Sections 2051 and 2071 are in Division 2, Part 1, Chapter 2 of the Insurance Code, which is entitled "The Fire Insurance Contract."  Chapter 2 contains three articles, the first (irrelevant here) concerning "Change of Risk," the second (containing section 2051) governing the "Measure of Indemnity" and the third (containing section 2071) governing the "California Standard Form Fire Insurance Policy."

[16]  As the Commissioner points out, the Legislature is presumed to have been aware of judicial precedent in effect at the time it enacts or amends legislation and to have acted in light of such precedent.  (*In re W.B.* (2012) 55 Cal.4th 30, 57.)  By adopting two measures of "actual cash value" neither of which corresponds with the definition adopted in *Jefferson*, the Legislature signaled its intent to change the law and effectively overrule *Jefferson*.  Further, an Enrolled Bill Report recognizes that the bill would have "LEGAL IMPACT," specifically on *Jefferson,* which it described as "California authority that defines actual cash value."  (State and Consumer Services Agency, Enrolled Bill Rep. on Assem. Bill No. 2962 (2003–2004 Reg. Sess.) prepared for Governor Schwarzenegger (Sept. 15, 2004) p. 5.)

[17]  *Doan v. State Farm General Ins. Co.* (2011) 195 Cal.App.4th 1082, also cited by FAIR, is not to the contrary.  The issue there was whether appraisal provisions included in property insurance policies as required by section 2071 required policyholders to exhaust the appraisal process before seeking declaratory relief on the pure legal issue of whether the insurer's method of calculating depreciation was permissible.  (*Doan*, at pp. 1088, 1091.)  The court had no occasion to determine the meaning or measure of "actual cash value" for any purpose.  It did state in dicta that "[a]s used in [section 2071], actual cash value 'is synonymous with "fair market value[,]" ' " citing *Jefferson*.  (*Doan*, at p. 1092.)  But it also stated that under section 2051, "when an

14

superseded prior California Supreme Court decision]; *City and County of San Francisco v. Cobra Solutions, Inc*. (2006) 38 Cal.4th 839, 850 [statute superseded prior court of appeal decision].)

But, FAIR argues, "there is no indication that the Legislature intended to abrogate the Supreme Court's interpretation of the phrase 'actual cash value of the property' as used in section 2071." The Legislature's failure to specifically amend section 2071, FAIR contends, gives rise to a presumption that it did not intend to alter the operation of that section. We disagree. Section 2071 did not and does not define "actual cash value," although the court interpreted that phrase in *Jefferson*. As already discussed, the Legislature thereafter, in amending closely related provisions of the Insurance Code, specifically defined that same phrase in a manner different from the definition adopted in *Jefferson*. The 2004 legislation thus does indicate a legislative intent to abrogate *Jefferson* in part.

FAIR also argues that section 2051 "does not repeal the actual cash value limit set forth in section 2071." But the argument relies on a statutory construction that would give "actual cash value" two different meanings as applied to an open fire insurance policy. In measuring the recovery for a partial loss under the mandatory language of section 2051, "actual cash value" is the lesser of the policy limit or the cost to repair or replace the damaged property, less a deduction for physical depreciation. This would be further limited, according to FAIR, by reading the language "to the extent of the actual cash value of the property at the time of loss" in section 2071 to mean the fair market value of the damaged property. Thus, in FAIR's view, section 2051, in conjunction with

open policy 'requires payment of actual cash value' for a structure's contents, 'the measure of the actual cash value recovery' is 'the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured less a fair and reasonable deduction for physical depreciation based upon its condition at the time of the injury or the policy limit, whichever is less.' " (*Doan*, at p. 1093.) These descriptions provided background for the court's discussion of the appraisal process. The court did not decide the meaning of "actual cash value" as used in either section 2071 or 2051 or attempt to reconcile the differences it attributed to these statutes.

section 2071, means that a property owner whose home is damaged but not destroyed may recover *not* the lesser of *two* measures (the policy limit and the cost to repair or replace the damaged property minus depreciation) but the *least* of *three* (the policy limit, the cost to repair or replace minus depreciation *and* the fair market value of the property). FAIR does not explain how the words of sections 2071 and 2051 support its position, and for the reasons just stated, they do not.

FAIR argues, however, that this interpretation is necessary to harmonize sections 2051 and 2071. We are not convinced. To continue to interpret the language "actual cash value" in section 2071 to mean fair market value in the face of section 2051's specific definitions of that phrase would run contrary to the general presumption that a word or phrase used in a particular sense in one part of a statute is intended to have the same meaning if it appears in another part of the same statute. (*Delaney v. Baker* (1999) 20 Cal.4th 23, 41.) The presumption is "rebuttable if there are contrary indications of legislative intent" (*id*. at pp. 41–42), but FAIR fails to identify such indications in the legislative history**,** and we are not aware of any.

Further, if the Legislature had intended to impose a fair market value "cap" or limit on recovery for partial loss to a structure, it would have included fair market value as an express limitation in subdivision (b)(2) of section 2051. This is made evident by the fact that the Legislature included precisely such an express limitation on recovery for *total* losses to a structure in subdivision (b)(1). (See § 2051, subd. (b)(1) ["In case of total loss to the structure, the policy limit *or the fair market value* of the structure, *whichever is less*"], italics added.) If that is what it intended for subdivision (b)(2), it could and would have used the same or similar language.

Finally, reading the language in section 2071, "to the extent of the actual cash value of the property" to mean "to the extent of the [fair market value] of the property" would create a redundancy with section 2051, subdivision (b)(1), which already limits recovery for total loss to a structure to "the policy limit *or the fair market value* of the structure, whichever is less." (Italics added.) (See *Pacific Legal Foundation v. Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 114 ["Wherever reasonable,

16

interpretations which produce internal harmony, avoid redundancy, and accord significance to each word and phrase are preferred"].)

Nor do we agree with FAIR that interpreting the phrase "actual cash value" in section 2071 to mean the same as "actual cash value" defined in section 2051 will result in an implied repeal of section 2071. Again, section 2071 prescribes the basic terms of a fire insurance policy from which, under section 2070, an insurer may not generally deviate. It uses the phrase "actual cash value" but, unlike section 2051, does not prescribe a measure for it or otherwise define it. The definition FAIR urges, which focuses on fair market value, comes from case law discussing an earlier statutory regime, not from section 2071. As incorporated into section 2071, section 2051's definitions of actual cash value superseded the *Jefferson* court's definition in part.[18] But that does not mean section 2051 repealed section 2071.

On the contrary, section 2051 can readily be harmonized with section 2071 by simply incorporating into section 2071 the more specific measures of "actual cash value" now prescribed by section 2051. As the Commissioner explains, "[s]ection 2051 did not repeal section 2071—rather, it provided a clear and consistent measure of actual cash value that informs the reference to the term 'actual cash value' in 2071. Thus, sections 2051 and 2071 do not conflict and must be read together to effectuate the intent of the Legislature."

As so construed, section 2071 retains outer limits on insurers' liability under an open fire insurance policy. Those outer limits are the "actual cash value" *as defined in section 2051*. In the case of a total loss to a structure, the outer limits are set by the lesser of fair market value or the policy limit, and in the case of a partial loss to a structure (or loss to the contents), the outer limits are defined by the lesser of the cost to repair minus depreciation or the policy limit. FAIR fails to explain why, thus reconciled with section 2051, section 2071 does not continue to serve its function of specifying the

---

[18] We say "in part" because under section 2051 fair market value still plays a role in defining actual cash value where there is a total loss of a structure.

17

minimum requirements for fire insurance policies in California.  We conclude that it does so.

## C. The Legislative History of Section 2051 Also Supports Garnes's View of FAIR's Statutory Obligations.

In 2004, the Legislature adopted Assembly Bill No. 2692 (AB 2692), amending section 2051 to add subdivision (b) which prescribes "the measure of actual cash value recovery" under an open actual cash value policy.  (Stats. 2004, ch. 605, § 2.)[19]  The legislative history of AB 2692, which was sponsored by the Commissioner and the Department of Insurance (Assem. Insurance Com., Background Information Sheet on Assem. Bill No. 2962 (2003–2004 Reg. Sess.) Mar. 18, 2004, p. 2), further supports Garnes's view of FAIR's statutory obligations to pay for the repairs of her home.[20]

The purpose of AB 2692 is made plain in many documents contained in the legislative history files.  In the wake of a series of devastating wildfires in Southern California that destroyed thousands of homes,[21] legislators were concerned about a lack of clarity in insurance policies and inconsistent practices by insurers regarding the

---

[19]  AB 2692 not only added subdivision (b), but also enacted a new section 675.1, which prohibits insurers from cancelling coverage in the case of a total loss to the structure while the structure is being reconstructed (§ 675.1, subd. (b)) and, if the time for renewal occurs before reconstruction is complete, requires insurers to adjust the limits, coverages and premiums to reflect the change in the insured's exposure to loss.  (*Id*., subd. (a).)

[20]  Garnes also asks us to consider the legislative history of a similar, but not identical, predecessor bill, Senate Bill No. 1678, which was proposed in 2002 by Senator Richard Polanco but which, after a number of amendments, ultimately failed to pass out of committee.  We decline to do so because neither house of the Legislature passed Senate Bill No. 1678, and the history that surrounds it thus "cannot be deemed a reliable and clear indication of the Legislature's intent" two years later, when the Legislature enacted AB 2692.  (See *Medical Bd. v. Superior Court* (2003) 111 Cal.App.4th 163, 181–182.)

[21]  (Assem. Insurance Com., Background Information Sheet on Assem. Bill No. 2962 (2003–2004 Reg. Sess.) Mar. 18, 2004, p. 1.)  For a discussion of other legislation passed and a regulation adopted in response to the same wildfires, see *Association of California Ins. Companies v. Jones* (2017) 2 Cal.5th 376, 382–385.

determination of "actual cash value" in adjusting claims under residential fire insurance policies. It is not entirely clear from the legislative history what gave rise to these concerns, but the state of the law at the time provides some idea. (See *San Francisco Internat. Yachting Group v. City and County of San Francisco* (1992) 9 Cal.App.4th 672, 680 ["Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining legislative intent"].)

Prior to 2004, section 2051 provided: "Under an open policy, the measure of indemnity in fire insurance is the expense to the insured of replacing the thing lost or injured in its condition at the time of the injury, such expense being computed as of the time of the commencement of the fire." (Stats. 1935, ch. 145, art. 2, p. 595.) In 1970, the California Supreme Court in *Jefferson* interpreted "actual cash value" to mean fair market value. And in 1998, an appellate court in *Cheeks v. California Fair Plan Assn.* (1998) 61 Cal.App.4th 423 stated that an insurer could define "actual cash value" in a manner different from that required by section 2071 as interpreted by *Jefferson* by simply drafting their policy to "say so." (*Cheeks*, at p. 429.)[22]

Against this muddled legal backdrop, it is perhaps not surprising that, as the legislative history reflects, insurers were using a variety of different measures of "actual cash value" when adjusting claims made under fire insurance policies, only one of which was replacement cost minus depreciation, and that disagreements about how to measure the recovery under fire insurance policies were a source of continuing conflict between insurers and policyholders.

---

[22] Further, as Garnes's counsel pointed out at oral argument, while the fair market value of a home that has been destroyed in a total loss is easy enough to ascertain, it is not obvious what method should be used to determine the fair market value of *parts* of a home that are merely damaged.

19

For example, the Background Information Sheet regarding AB 2692 for the Assembly Insurance Committee,[23] in a description of "existing law on this issue," stated: "The California Residential Property Insurance Disclosure provides coverage definitions; however, the valuation of property is unclear and continues to be an issue between insurance companies and consumers." (Assem. Insurance Com., Background Information Sheet on Assem. Bill No. 2962 (2003–2004 Reg. Sess.) Mar. 18, 2004, p. 1.) It described what the bill did as follows: "Clarifies the measurement of 'actual cash value' in relation to a homeowners insurance policy. Prohibits insurance companies from deducting depreciation for labor when consumers replace or rebuild their property." (*Ibid.*) In a section entitled "What's wrong with existing law? Why is this bill needed?," it stated: "Many homeowners policies do not clearly define how 'actual cash value' will be determined" and referred to a practice by insurance companies in calculating actual cash value of deducting the cost of labor. (*Id.* at pp. 1–2.) It further stated: "This bill will explain and provide consistency for how claims will be adjusted and prohibit insurance companies from deducting the cost of labor in settlements." (*Id.* at p. 2.)

Similarly, a Report by the Assembly Committee on Insurance,[24] dated May 5, 2004, states: "The purpose of the bill, according to the author, is to explain and provide consistency for how claims will be adjusted and prohibit insurance companies from deducting the cost of labor in settlements. The author states that many homeowners' policies do not clearly define how 'actual cash value' is to be determined, and additionally, when calculating this value, most insurance companies deduct the cost of labor. Thus, supporters believe that consumers are forced to pay out-of-pocket costs for a portion of the repairs. The author believes that this bill would clarify the measurement of 'actual cash value' in relation to a homeowner's insurance policy." (Assem. Com. on

---

[23] Courts consider such background information documents in discerning legislative intent. (See *Quarry v. Doe I* (2012) 53 Cal.4th 945, 987; *Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 899–900.)

[24] Committee reports also are an appropriate source of legislative intent. (See *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1401.)

20

Insurance, Rep. on Assem. Bill No. 2962 (2003–2004 Reg. Sess.) as proposed to be amended May 5, 2004, p. 1.)  The same report goes on to note that "the author of the bill highlights that the California Residential Property Insurance Disclosure provides coverage definitions; however, the valuation of property is unclear and continues to be an issue between insurance companies and consumers." (*Id.* at p. 2.)

Also, a report of the Senate Committee on Insurance dated June 16, 2004, explains:  "Existing law [¶] 1.  Defines an 'open policy' of fire insurance, generally speaking, as one that does not state the amount for which the item is insured, but also states, in essence, that the measure of payment is the expense to replace the item in its condition at the time just prior to commencement of the fire [Section 2051]; [¶] 2. Otherwise leaves unanswered important questions about how to calculate actual cash value." (Sen. Com. on Insurance, Rep. on Assem. Bill No. 2962 (2003–2004 Reg. Sess.) as proposed to be amended June 16, 2004, p. 1.)  It goes on to explain: "This bill [¶] 1. Would specify that actual cash value, in the case of a total loss, would be equal to the policy limit or fair market value of the structure, whichever is less; [¶] 2.  Would specify that actual cash value, in the case of a partial loss to the structure or contents, would be the amount it would cost the insured to repair, rebuild, or place [*sic*] the thing lost or injured *less a fair and reasonable deduction for physical depreciation* based upon the condition at the time of the injury or the policy limit, whichever is less; [¶] 3.  Would specify, also with respect to a partial loss of a structure, that a deduction for depreciation shall apply only to parts of the structure that are normally subject to repair or replacement." (*Ibid.*)  It describes the purpose of the bill as "[t]o clarify the measurement of 'actual cash value' under a homeowners' insurance policy, and to provide protections against cancellation during the rebuilding process." (*Id*. at p. 2.)  It further states that "[a]ccording to the author's office, many homeowners' policies do not clearly define how 'actual cash value' will be determined.  The bill is needed to provide consistency in the calculation of 'actual cash value.'  Consistency will further protect consumers." (*Ibid.*)

21

Finally, as described in an enrolled bill memorandum[25] AB 2962 was designed, among other things, to "clarify the measurement of 'actual cash value' in relation to a homeowners' insurance policy and help resolve disputes between insurers and their policyholders." (Enrolled Bill Memo. on Assem. Bill No. 2962 (2003–2004 Reg. Sess.) prepared for Governor Schwarzenegger (Sept. 10, 2004) p. 1.) The same memorandum contains language similar to that in earlier reports, expressing the author's statement that "the valuation of property is unclear and continues be an issue between insurance companies and consumers." (*Id.* at p. 2.)

Significantly, another enrolled bill report explicitly recognized that AB 2692 would change the law as articulated in *Jefferson*: A section entitled "LEGAL IMPACT" states: "Jefferson v. Superior Court, 3 Cal.3d 398 (1970); California authority that defines actual cash value." (State and Consumer Services Agency, Enrolled Bill Rep. on Assem. Bill No. 2962 (2003–2004 Reg. Sess.) prepared for Governor Schwarzenegger (Sept. 15, 2004) p. 5.) This suggests the Legislature understood that AB 2692 would supplant *Jefferson*'s definition of "actual cash value" with the measure set forth in the bill**.**

FAIR barely acknowledges this legislative history,[26] which undermines its contention that section 2051, subdivision (b) provides a measure of "actual cash value" that is effectively modified and limited by ascribing a different meaning to the same phrase as used in section 2071. The Legislature was attempting to eliminate confusion and disagreement, not to create them. To read the "actual cash value" in section 2071 to mean "fair market value" and to create an additional limitation on recovery for partial

---

[25] The California Supreme Court has routinely considered statements in enrolled bill reports and memoranda as evidence of the Legislature's intent. (See *Lockheed Information Management Services Co. v. City of Inglewood* (1998) 17 Cal.4th 170, 184; *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1149.)

[26] FAIR merely concedes that the Legislature was concerned "that insurance policies were inconsistent or unclear as to how they defined 'actual cash value.' "

22

losses beyond the limits imposed in section 2051 would create unnecessary complexity and inject uncertainty into the measure of recovery for a partial loss to a structure, undermining the legislative goals of providing clarity and avoiding disputes. As we have already stated, if the Legislature had intended to limit "actual cash value" for partial losses by fair market value, it could have done so clearly by expressing that limitation in subdivision (b)(2) of section 2051. Further, if that had been the Legislature's intent, one would expect to see some indication of it in the legislative history of AB 2962, but there is none.

For these reasons, the legislative history supports Garnes's interpretation of Insurance Code sections 2071 and 2051.

## D. The Insurance Commissioner's and the Legislature's Interpretations Also Support Garnes's View of FAIR's Statutory Obligations.

Other factors support Garnes's interpretation. First, the Insurance Commissioner's interpretation is consistent with hers. While we are not bound by the Commissioner's interpretive regulation, we nonetheless accord it " 'great weight and respect.' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11–12 (*Yamaha*).)

The Commissioner's interpretation is best reflected in a regulation the Commissioner amended in 2006 to include the following language: "Under a policy, subject to California Insurance Code Section 2071, where the insurer is required to pay the expense of repairing, rebuilding or replacing the property destroyed or damaged with other of like kind and quality, the measure of recovery is determined by the actual cash value of the damaged or destroyed property, as set forth in California Insurance Code Section 2051." (Cal. Code Regs., tit. 10, § 2695.9.) The Commissioner maintains this interpretation in his amicus curiae brief, and it deserves significant deference.[27] The Commissioner's interpretation obviously supports Garnes's interpretation.

---

[27] Specifically, the *Yamaha* factors weigh powerfully in favor of affording this significant deference. The Legislature has empowered the Commissioner to adopt rules and regulations as necessary to implement the insurance laws of the state. (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 824 [discussing broad powers of

Second, as the Commissioner points out, the Legislature itself interpreted sections 2051 and 2071, albeit in legislation enacted six years after the amendment of section 2051. (See *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 724 [" 'While "subsequent legislation interpreting [a] statute . . . [cannot] change the meaning [of the earlier enactment,] it [does] suppl[y] an indication of the legislative intent which may be considered together with other factors in arriving at the true intent existing at the time the legislation was enacted" ' "].) Specifically, in sections 10101 and 10102, the Legislature prescribed a form of disclosure statement that insurers are required to provide consumers when issuing or renewing a policy of residential property insurance. That form informs purchasers of actual cash value coverage that "ACTUAL CASH VALUE COVERAGE pays the costs to repair the damaged dwelling minus a deduction for physical depreciation. If the dwelling is completely destroyed, this coverage pays the fair market value of the dwelling at the time of loss. In either case, coverage only pays for costs up to the limits specified in your policy." The Legislature's interpretation supports Garnes's interpretation of sections 2051 and 2071 in two respects. It indicates that actual cash value in the case of a damaged dwelling means the costs to repair the dwelling minus physical depreciation, and that the only cap in that situation is "the limits specified" in the policy. Only where the dwelling is "completely destroyed" is "actual cash value" limited to "the fair market value of the dwelling at the time of loss." It also indicates that "partial loss to the structure" and "total loss to the structure" in section 2051 mean, respectively, that the dwelling is "damaged" and that "the dwelling is completely destroyed."

---

Commissioner]; Gov. Code § 11152; see §§ 12921.7, 12923.) The Insurance Code provisions at issue in this case contain language that is " 'technical, obscure [and] complex' " and " 'entwined with issues of . . . policy.' " (See *Yamaha*, *supra*, 19 Cal.4th at p. 12.) Interpretation of sections 2051 and 2071 falls squarely within the Department's legislatively designated field of expertise. (See *Yamaha*, at pp. 12–13.) Further, the Commissioner's interpretive amendment to this rule was adopted in 2006, and is near contemporaneous with the 2004 legislation it interprets; and it is a " 'long-standing' " and " 'consistently maintained' " interpretation. (See *Yamaha* at pp. 12–13.)

24

### E. FAIR's Other Arguments Are Unpersuasive.

FAIR argues that Garnes and the Commissioner's interpretation of section 2051, subdivision (b) would lead to absurd results because, if she had suffered a total loss, her recovery would have been limited to fair market value, whereas the partial loss she in fact sustained does not so limit her recovery. We disagree. It is conceivable the Legislature intended for homeowners whose houses were not entirely destroyed to have the option of repairing their homes and remaining in the homes and neighborhoods they had chosen (and, for some homeowners, such as Garnes, in the neighborhoods and homes they had grown up in).

Indeed, this would hardly be the first time that real property has been recognized as unique (see *Real Estate Analytics, LLC v. Vallas* (2008) 160 Cal.App.4th 463, 475, 476; Civ. Code, § 3387), especially regarding a home. (See *Lennar Homes of California, Inc. v. Stephens* (2104) 232 Cal.App.4th 673, 689; *Reese v. Wong* (2001) 93 Cal.App.4th 51, 59, fn. 5; Code Civ. Proc., § 405.33; Civ. Code, § 3387 [presumption of uniqueness conclusive in case of single-family dwelling party intends to occupy].) Courts have recognized that homes may have values to an owner that are distinct from economic worth, such as familiarity, comfort and the memories they invoke, and accorded them legal significance. (E.g., *In re Marriage of Duke* (1980) 101 Cal.App.3d 152, 158 [emotional attachment of custodial parent and children to long-time family residence is fact to be considered in determining its disposition].)

The Legislature may well have concluded that, in the case of a home that is not destroyed and is amenable to repair, a measure of indemnity that provides for repair and rebuilding serves to preserve these intangible interests, at least to some degree. It may also have concluded that where a home is destroyed so completely that these attributes can no longer be enjoyed, a recovery that will enable the owner to purchase a dwelling of equal economic value is appropriate. We thus disagree with FAIR that the interpretation of sections 2051 and 2071 urged by Garnes and the Insurance Commissioner produces absurd results.

25

FAIR also argues that Garnes and the Commissioner's interpretation would "eliminate[] the distinction between actual cash value and replacement policies." FAIR is correct in stating that replacement cost policies provide greater coverage than ACV policies. (See § 10102 ["Actual Cash Value Coverage is the most limited level of coverage listed"].) It is also true, as FAIR points out, that "a replacement cost policy pays the insured the replacement cost of the lost or damaged property regardless of its fair market value and without deduction for depreciation." However, the role that fair market value and depreciation play in the insured's indemnity obligation under ACV and replacement cost policies is different depending on whether loss to a structure is partial or total. When the indemnity afforded by ACV and replacement cost coverage provided under the Insurance Code is compared for both partial and total losses, it becomes apparent that the interpretation of the Code adopted by Garnes and the Commissioner does not conflate ACV and replacement cost coverage.

Indeed, as we have already alluded to, the differences between the two, under California law, are summarized succinctly in the mandatory form of disclosure contained in section 10102.[28] "ACTUAL CASH VALUE COVERAGE pays the costs to repair the damaged dwelling minus a deduction for physical depreciation. If the dwelling is completely destroyed, this coverage pays the fair market value of the dwelling at time of loss. In either case, coverage only pays for costs up to the limits specified in your policy." (§ 10102, subd. (a).) "REPLACEMENT COST COVERAGE," "EXTENDED REPLACEMENT COST COVERAGE" and "GUARANTEED REPLACEMENT COST COVERAGE" are all "intended to provide for the cost to repair or replace the damaged

---

[28] The disclosure statement is consistent with the measures of indemnity provided in section 2051, which governs open ACV policies and section 2051.5, which applies to open replacement cost policies. The latter section provides in relevant part that "Under an open policy that requires payment of the replacement cost for a loss, the measure of indemnity is the amount that it would cost the insured to repair, rebuild, or replace the thing lost or injured, without a deduction for physical depreciation, or the policy limit, whichever is less." (§ 2051.5.)

26

or destroyed dwelling, without a deduction for physical depreciation." Replacement Cost Coverage pays replacement costs "up to the limits specified in your policy"; Extended Replacement Cost Coverage "provides additional coverage above the dwelling limits up to a stated percentage or specific dollar amount"; and "Guaranteed Replacement Cost Coverage" "covers the full cost to repair or replace the damaged or destroyed dwelling . . . regardless of the dwelling limits shown on the policy declarations page."

In other words, in comparing the two types of coverage with respect to a partial loss, an ACV policy pays the costs to repair "minus a deduction for physical depreciation" up to the limits of the policy, whereas a replacement cost policy pays the cost to repair "without a deduction for physical depreciation" up to the limits of the policy, and for Extended and Guaranteed replacement cost coverage, beyond the limits of the policy. For total losses, ACV pays the fair market value of the dwelling at the time of loss, whereas replacement coverage pays for replacement costs up to, or beyond, the limits of the policy.

This comparison, which is entirely consistent with Garnes and the Commissioner's interpretation of sections 2051 and 2071, belies FAIR's contention that such interpretation will eliminate the distinction between ACV and replacement cost policies. As the form disclosure statement reflects, the two types of policy provide different indemnity measures for both partial losses and total losses, and replacement policies provide more generous coverage than ACV policies. The further fair-market-value cap FAIR would have us read into sections 2051 and 2071 is not required to achieve this result. In short, FAIR's interpretation is a solution in search of a problem.

FAIR also argues that Garnes and the Commissioner's interpretation would "circumvent" the provision in section 2051.5 that allows insurers to withhold a portion of the replacement cost under a replacement cost policy until the insured completes the repair or rebuilding of the property. That section provides in relevant part that "[i]f the policy requires the insured to repair, rebuild, or replace the damaged property in order to collect the full replacement cost, the insurer shall pay the actual cash value of the damaged property, as defined in Section 2051, until the damaged property is repaired,

27

rebuilt, or replaced" and that "[o]nce the property is repaired, rebuilt, or replaced, the insurer shall pay the difference between the actual cash value payment and the full replacement cost reasonably paid to replace the damaged property, up to the limits stated in the policy." (§ 2051.5, subd. (a).) "Had Garnes purchased a replacement cost policy," FAIR contends, "she would have been entitled to the amount needed to rebuild, repair or replace the damaged property *only* upon showing that she had made those repairs." "That is, actual repair or replacement of the damaged property is a condition precedent to recovery of replacement costs." Under Garnes's interpretation, FAIR contends, "she would be entitled to replacement cost recovery without having to first repair the property or to otherwise comply with section 2051.5(a)."

FAIR's description of the statute is not accurate. Section 2051.5, subdivision (a) does not require insureds to repair or replace as a "condition precedent" to recovery of replacement costs. Rather, it implicitly allows FAIR or other insurers to include a provision in the policy requiring the insured to repair or rebuild in order to collect "the *full* replacement cost." (§ 2051.5, subd. (a), italics added.) However, it requires the insurer in the meantime to pay "the actual cash value of the damaged property" until the damaged property is repaired or rebuilt, and then to pay the difference between actual cash value and full replacement cost once the repair or rebuilding is completed. (*Ibid.*)

Moreover, FAIR does not explain or provide authority for what its obligations are where replacement costs are provided under an ACV policy, much less how they differ from its obligations under section 2051.5, subdivision (a) for a replacement cost policy. Under both types of policy, "actual cash value," as interpreted by Garnes and the Commissioner, for a partial loss means replacement cost minus depreciation, or the policy limits, whichever is less. However, the indemnity measure under a replacement cost policy is replacement costs "without a deduction for physical depreciation," or the policy limits, whichever is less. Under an ACV policy, the owner is entitled to actual cash value, period: that is, the lesser of the policy limit or replacement costs minus depreciation. Under section 2051.5, subdivision (a), under a replacement policy that requires repair, rebuilding or replacement, the owner is entitled to actual cash value in the

28

same amount as an ACV policyholder, at the outset, but in addition, is entitled to the difference between actual cash value and full indemnity (replacement costs without depreciation) at the conclusion of repair or rebuilding. There is no anomaly in this result. The two types of policyholders are treated the same before completion of repair or rebuilding, but the replacement policyholder ultimately receives an additional payment, and is therefore better off than the ACV policyholder, once repair or rebuilding is complete.

In short, this argument, too, lacks merit.

Finally, FAIR argues that Garnes and the Commissioner's interpretation would create a "moral hazard." It posits that "[s]ince a partial loss may easily exceed the actual cash value (fair market value) of the property, an insured could purchase an old, run-down property, over-insure it and hope for a convenient fire that would not totally destroy the property." Further, "[i]f Garnes' interpretation were to be adopted, an insured would have every incentive to make a claim for the cost of repairs, then sell the property as a teardown and pocket the balance."

The "hazard" FAIR describes is, to be generous, overstated. The idea that individuals would purchase a "run-down" property and then "hope for a convenient fire that would not totally destroy the property" is at best speculative. Further, if FAIR means to suggest an owner might bring about such a fire intentionally, such "moral hazard" could be rectified by the insurer's invocation of the intentional acts exclusion of section 533 to deny coverage. Regardless, FAIR's argument amounts to an attack on the policy underlying the standard form fire insurance policy as adopted by the Legislature. To the extent FAIR thinks it ought to be revised, it is a matter for the Legislature, not this court.

## II.

### *The Insurance Code Governs FAIR's Obligations To Garnes.*

The parties also dispute whether the Policy is to be applied in accordance with its terms or instead in accordance with the Insurance Code. FAIR argues that regardless of whether the Policy complies with the governing Insurance Code provisions, this case and

29

its obligations to Garnes are "governed by the policy she purchased, not by some statutory form policy she never purchased."  Garnes relies on *Century-National Ins. Co. v. Garcia* (2011) 51 Cal.4th 564 (*Century-National*) for the proposition that "a fire insurance policy that offers less coverage than the standard form (Insurance Code §2071) is invalid," and "that insurers may not provide less coverage than appears in the form fire policy set forth in §2071."

In view of this dispute, a few words about the intersection of insurance policies and the Insurance Code are in order.  As Witkin points out, "All insurance policies issued in California are governed by the provisions of the Insurance Code.  [Citation.]  When insurance coverage is required by law, the statutory provisions are incorporated into the insurance contract.  The obligations under an insurance policy are measured and defined by the pertinent statute, and the statute and the policy together form the insurance contract.  [Citation.]  This general principle is subject to the condition that statutory provisions may not be read into a policy to the insured's detriment, even where the statutory language appears mandatory."  (2 Witkin, Summary of Cal. Law (10th ed. 2005) Insurance, § 8, p. 30.)

"While the duties and obligations of the insurer and the insured are contractual in nature, neither party has the inviolate rights that normally characterize private contracts.  This is because the business of insurance is a matter of the public interest, and insurance contracts are subject to the reasonable exercise of the state's police power.  [Citation.]  Any provision in an insurance policy that fails to conform to law or violates public policy is unenforceable."  (2 Witkin, Summary of Cal. Law, *supra*, § 8. p. 30.)  Finally, "[p]olicies may be required to include certain provisions."  (*Ibid*. [citing as example § 11580].)

Consistent with these principles, courts have long held that "an insurer has the right to limit policy coverage in plain and understandable language and . . . may limit the nature of the risk it undertakes to assume.  [Citations.]  Nevertheless, an insurance company's limitation of coverage must conform to the law and public policy.  [Citation.]  Furthermore, it is also well settled that insurance contracts, as contracts of adhesion, are

30

subject to careful judicial scrutiny to avoid injury to the public. [Citation.] Courts considering adhesion contracts have a heightened responsibility to prevent the marketing of policies that provide unrealistic and inadequate coverage. Thus, any portion of an insurance contract which is violative of public policy is not enforceable." (*Carson v. Mercury Ins. Co.* (2012) 210 Cal.App.4th 409, 425–426.)[29]

*Century-National*, on which Garnes relies, applied these principles to a fire insurance policy challenged by the insureds as inconsistent with section 2071. The California Supreme Court held an exclusionary clause that was less favorable to the insureds than the section 2071 standard form policy impermissibly reduced the statutorily mandated coverage and thus was invalid and unenforceable. (*Century-National*, *supra*, 51 Cal.4th at pp. 566, 573.) It reversed the Court of Appeal's affirmance of a trial court ruling sustaining the insurer's demurrer based on this exclusion provision in the policy. (See *ibid*.) The insured was entitled to enforce the policy notwithstanding the invalid provision.

Specifically, *Century-National* involved a fire insurance policy that contained clauses precluding coverage if the loss was caused by the intentional act or criminal conduct of "any insured." (*Century-National*, *supra*, 51 Cal.4th at p. 566.) The court concluded these clauses "impermissibly reduce coverage that is statutorily mandated." (*Ibid*.) Under the policy, as written, the insureds could not recover against Century-National even if they were innocent of wrongdoing because their losses were caused by a fire intentionally set by their son, who was a co-insured. (*Id*. at pp. 566, 568.) Although the policy "purport[ed] to exclude coverage" of the insureds' losses, the court held "section 2070 requires a comparison of the policy with the standard form fire policy set forth in section 2071." (*Id*. at p. 569.) The question was "whether the Century-National policy provides coverage that is at least as favorable to the insureds as the coverage

---

[29] As a case cited by the Insurance Commissioner reflects, this rule is of long standing. (See *Wildman v. Government Emp. Ins. Co.* (1957) 48 Cal.2d 31, 39–40 (*Wildman*) [discussing older cases, including *Malmgren v. Southwestern Auto. Ins. Co.* (1927) 201 Cal. 29].)

provided in the standard form." (*Ibid.*) If it did not, the exclusion "to that extent" was invalid. (*Ibid.*)

The Supreme Court determined that, while the statutory standard form contained "no express exclusion for losses caused by intentional acts or criminal conduct," section 533 set forth such a willful act exclusion that was incorporated into the standard form policy. (*Century-National*, *supra*, 51 Cal.4th at pp. 568–569; see *id*. at p. 570 [referring to section 533 as "implied statutory exclusion"].) But section 533 was a more limited exclusion than that in the Century-National policy. "Section 533's use of the term 'the insured' bears directly on the instant coverage issue: unlike policy exclusions that refer to 'an' insured or 'any' insured, exclusions based on acts of 'the' insured are construed as not barring coverage for innocent coinsureds. [Citations.] Given the settled meaning of the language used in section 533, the standard form fire policy must be construed as including a willful acts exclusion that is protective of innocent insureds." (*Century-National*, at p. 569.) Because, "under the standard form, which must be read as including section 533's exclusion for losses caused by 'the wilful act of *the* insured', . . . innocent insureds would not be barred from coverage," the court concluded that "the intentional acts exclusion in the Century-National policy results in coverage that is not at least substantially equivalent to the level of protection provided in the statutory standard form fire policy" and therefore was "invalid." (*Id*. at p. 573.)

In *Howell v. State Farm Fire & Casualty Co.* (1990) 218 Cal.App.3d 1446, disapproved on other grounds in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532, fn. 8, also cited by Garnes, Division Three of this court held that a policy provision that conflicted with Insurance Code provisions is unenforceable. The court held that an insurer could not enforce a policy exclusion that was inconsistent with section 530 as interpreted by our Supreme Court in *Sabella v. Wisler* (1963) 59 Cal.2d 21. (*Howell*, at p. 1456.)

Section 530 and *Sabella* govern how coverage is determined when there is a concurrence of different causes of loss. (See *Howell*, *supra*, 218 Cal.App.3d at p. 1453.) The insurer in *Howell*, State Farm, argued that it could "contractually exclude coverage"

notwithstanding section 530 and *Sabella*. (*Howell*, at p. 1457.) Our court flatly rejected that argument, citing three earlier cases in which the courts had "applied the *Sabella* efficient proximate cause analysis despite the presence of specific exclusionary language not present in the *Sabella* contract." (*Id.* at p. 1458.) We stated: "The simple truth— which State Farm insists on ignoring—is that this provision is a part of the statutory law of this state and is applicable to all insurers who issue 'all risk' policies. For this simple reason, the exclusions contained in the policies at issue are not enforceable to the extent they violate . . . section 530." (*Ibid*; see also *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 754 (*Julian*) [citing *Howell* for the proposition that "[p]olicy exclusions are unenforceable to the extent that they conflict with section 530 and the efficient proximate cause doctrine"].)

Further, the court's reasoning in *Howell* was not limited to section 530. "Stated simply, the important question presented by this case is whether a property insurer may contractually exclude coverage when a covered peril is the efficient proximate cause of the loss, but an excluded peril has contributed or was necessary to the loss. We conclude that a property insurer may not limit its liability in this manner, since the statutory and judicial law of this state make the insurer liable whenever a covered peril is the 'efficient proximate cause' of the loss, regardless of other contributing causes. Consequently, the policy exclusions at issue in this case are not enforceable to the extent they conflict with California law." (*Howell*, *supra*, 218 Cal.App.3d at p. 1452, fn. omitted.)

*Century-National* and *Howell* hold, and *Julian* reiterates, that where California's statutory or decisional law require coverage, an insurer may not circumvent the law by employing contrary contract terms. FAIR counters with *Cheeks*, in which a panel of the Second District Court of Appeals suggested the opposite. However, it did so in dicta[30]

_____

[30] The court in *Cheeks* rejected FAIR's interpretation of the policy language it was using at the time, which was the same or similar to the standard form policy. (*Cheeks*, *supra*, 61 Cal.App.4th at pp. 426–429.) The court's comment that FAIR could have used other language that was inconsistent with section 2071 was unnecessary to its decision. (See *Cheeks*, at p. 429 & fn. 5.)

33

that can have no force after the California Supreme Court issued its decision in *Century-National* 13 years later. Further, *Howell* and *Julian* involved the requirements of sections 530 and 532, general provisions of the Insurance Code regulating causes of loss, and case law interpreting them. These cases demonstrate that where an insurer's policy contains terms that conflict with the law, the courts will decline to enforce the impermissible terms and read into the policy the terms required by statute. (See also *Wildman*, *supra*, 48 Cal.2d at pp. 39–40 [where policy provisions were in derogation of Vehicle Code sections, latter "must be considered a part of every policy of liability insurance even though the policy itself does not specifically make such laws a part thereof"]; *Utah Property & Casualty Ins. Guaranty Ass'n v. United Services Auto. Assn.* (1991) 230 Cal.App.3d 1010, 1019 & fn. 1 [and cases cited therein].)

FAIR seeks to distinguish *Century-National*, contending it involved an exclusion that conflicted with section 2071. According to FAIR, "Garnes does not claim that the FAIR Plan policy fails to comply with *section 2070 or 2071*. Rather, she claims the policy does not comply with *section 2051*." FAIR concedes that section 2071 is mandatory but argues "section 2051 contains no such mandatory language" and for this reason "*Century-National* is inapplicable."

We disagree for three reasons. First, Garnes plainly does argue that the Policy fails to comply with sections 2070 and 2071. She points out that section 2071 provides for coverage " 'to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair.' " She further argues that section 2051 defines "actual cash value" for purposes of the section 2071 standard form policy and that the statutory definition is "mandatory."

Second, FAIR's argument that section 2051 is not mandatory is spurious. Section 2051's language *is* mandatory. It provides: "Under an open policy that requires payment of actual cash value, the measure of the actual cash value recovery, in whole or partial settlement of the claim, *shall be determined as follows*: . . . ." (§ 2051, subd. (b), italics added.) It then sets forth the measures that apply in the case of total loss to the structure and in the case of partial loss to the structure. (*Ibid.*) And lest there be any

34

doubt about the meaning of "shall," section 16 provides that "[a]s used in this code the word 'shall' is mandatory." Moreover, the legislative history makes clear that the measures adopted in section 2051 were intended to be mandatory. The legislative goals of clarity, consistency and dispute avoidance would not be served if insurers could substitute other and conflicting provisions in their policies in place of section 2051. Section 2051 thus provides mandatory minimum coverage under an open ACV fire insurance policy.

Third, since mandatory insurance coverage provisions are incorporated into every policy to which they pertain, section 2051 is incorporated into the standard form policy set forth in section 2071, as indicated by case law, regulation and statute. In *Century-National* the court stated: "Because section 533 represents ' "an implied exclusionary clause which by statute is to be read into all insurance policies" ' [citation], the standard form fire insurance policy is properly read as excluding coverage for losses caused by 'the willful act of *the* insured.' " (*Century-National*, *supra*, 51 Cal.4th at p. 569.) Similarly, because section 2051 represents an implied coverage requirement which is to be read into all open ACV fire insurance policies, the standard form fire insurance policy is properly read as incorporating the measures of indemnity it sets forth.

Further, as the Commissioner points out, its Regulation 2695.9, subdivision (f)(1) explicitly incorporates section 2051 into the standard form policy. The regulation states: "Under a policy, subject to California Insurance Code Section 2071, where the insurer is required to pay the expense of repairing, rebuilding or replacing the property destroyed or damaged with other of like kind and quality, the measure of recovery is determined by the actual cash value of the damaged and destroyed property, as set forth in California Insurance Code Section 2051." (Cal. Code Regs., tit. 10, § 2695.9, subd. (f)(1).)

Finally, section 2070 requires "[a]ll fire policies" to be on the standard form or provide coverage for fire losses that is "substantially equivalent to or more favorable to the insured than that contained in such standard form fire insurance policy." (§ 2070.) The Policy, insofar as it purports to cap indemnity for partial losses at fair market value, or to treat a loss that does not destroy the structure as a "total loss," is not "substantially

35

equivalent to or more favorable to" Garnes than the standard form policy, read to incorporate the provisions of section 2051. The Policy, to that extent, is unenforceable, and we must treat it as if its indemnity terms conformed to section 2051.

In short, the Policy must be applied in accordance with the Insurance Code rather than by its own terms.

## DISPOSITION

The judgment is reversed, and we remand the case to the superior court for proceedings consistent with the views expressed in this opinion. Garnes is awarded costs of appeal.

_____
STEWART, J.

We concur.

_____
RICHMAN, Acting P.J.

_____
MILLER, J.

*California FAIR Plan Assn. v. Garnes* (A143190)

Trial Court:   Contra Costa County Superior Court

Trial Judge:   Hon. Steven Austin

Counsel:

Hereford Kerley, Law Office of Dylan Schaffer, Kerley Schaffer, J. Edward Kerley, Dylan L. Schaffer for Defendant and Appellant.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Chief Assistant Attorney General, Paul D. Gifford, Senior Assistant Attorney General, Joyce E. Hee, Supervising Deputy Attorney General, Robert E. Asperger, Deputy Attorney General for Dave Jones, Insurance Commissioner of the State of California as Amicus Curiae on behalf of Defendant and Appellant.

Amy Bach, Daniel Wade for United Policyholders as Amicus Curiae on behalf of Defendant and Appellant.

Lewis Brisbois Bisgaard & Smith, Raul L. Martinez, Elise D. Klein for Plaintiff and Respondent.