## John O'Hara and another v. Horace Carpenter.

*Contract to clear a citizen from draft, against public policy and void.* A contract in writing, whereby a party, in consideration of five hundred dollars, undertook, under a penalty of two thousand dollars, in case one O'Hara, who was an enrolled citizen of the United States, liable to be drafted into the military service, should be drafted so as to do duty in the United States army, against the late rebellion, within three years from the date of the contract, to "procure for him a substitute or otherwise clear him from said draft, and thus save him harmless from any cost or expense in consequence of the same," is against public policy and void.

*Promissory note without consideration.* A promissory note given in consideration of such a contract is without consideration, and cannot be enforced by the payees named therein.

*Heard July 10. Decided October 4.*

Error to Washtenaw Circuit.

This was an action of *assumpsit,* brought by Horace Carpenter against John O'Hara and Daniel O'Hara.

The case is fully stated in the opinion.

*Lawrence & Frazer,* for plaintiffs in error.

*N. W. Cheever* and *H. J. Beakes,* for defendant in error.

COOLEY, J.

The action in the court below appears to have been brought upon a promissory note given by John O'Hara, with Daniel O'Hara as surety, to Horace Carpenter and William S. Maynard. The facts are agreed upon, and are substantially the following:

1. That the defendant, John O'Hara, was, at, and before, the making of the note, to wit: on and before the 14th day of February, 1865, a citizen of the United States, a resident of the township of Ann Arbor, Washtenaw county, Michigan, of the age of thirty years, and liable to be drafted into the military service of the United States and duly enrolled under the acts of Congress then in force.

2. That at the making of said note, said John O'Hara had not been, nor was he afterwards, actually drafted into the military service of the United States.

3. That a draft had been ordered by the proper authority, under which the quota of men required to be furnished from the township of Ann Arbor aforesaid had been assigned, apportioned and established, and that at the time of the making of said note said quota had not been filled, and a draft was impending to fill such quota unless the same should be filled by volunteers.

4. That the defendants executed and delivered the note to the payees therein named, at the date of such note, and that the plaintiff was the holder thereof at and before the commencement of this suit.

5. That the consideration for said note was the following contract, executed and delivered by said Carpenter and Maynard to John O'Hara at the date of the note, to wit: "For and in consideration of five hundred dollars received of John O'Hara of the town of Ann Arbor, we hereby agree that in case said O'Hara shall be drafted so as to do duty

in the army of the United States against the present rebellion, within three years from this date, we will procure for him a substitute or otherwise clear him from said draft, and thus save him harmless from any cost or expense in consequence of the same, under a penal sum of two thousand dollars to be paid said O'Hara, his heirs or assigns, by us, our heirs, executors and administrators. Witness our hands and seals, this 14th day of February, 1865.

"WILLIAM S. MAYNARD. [Seal.]

"HORACE CARPENTER.      [Seal.]"

Upon this state of facts the makers of the note con-tended that the instrument was invalid, because the contract which was the consideration therefor was contrary to public policy and void in law, and for that reason was incapable of supplying the necessary consideration for the promise contained in the note.  But the circuit judge held otherwise, and the plaintiff had judgment. We think the circuit judge erred in this ruling. We find on examination of the contract that its general purpose was to insure and protect a citizen liable to perform military duty, against being compelled to do so. Some question was made on the argument, regarding the precise meaning of the words in the contract, "be drafted so as to do duty in the army," etc., but we can put no other construction upon them than that the parties insuring only undertook to pay the large sum specified by way of indemnification in the event of the draft being made effectual by a compulsory service of the insured party as a conscript in the army. The mere drafting was not to entitle the party to indemnity, but he was to be drafted so as to do duty; or in other words, do duty in the army in consequence of the drafting. This was what was insured against, and for such a drafting the indemnity was provided. The contract is compared by the defendant in error to other contracts of insurance, and it is strongly insisted that it is

equally entitled to legal protection; but it differs from other insurance in the important particular that in other cases the indemnity is against the actual or possible consequences of some evil, and makes the insurer interested with the insured in preventing such evil if possible, and in punishing the guilty cause of it, if such there be; while this contract, on the other hand, insures against the enforcement of a lawful proceeding which the law has directed for the protection and support of the government, and the interest of the insurer lies in having the proceeding defeated, and in giving countenance, encouragement and aid to any persons or to any measures which, legally or illegally, may interpose obstacles.

It is true that there was a mode in which the contemplated protection might have been legally given in this case; that is to say, by providing a substitute; and it is urged with much force that when a contract is capable of legal performance, it is but just to assume that the parties had such legal performance in view when they entered into the contract, and that they did not contemplate a violation of law. We are not at liberty, however, to shut our eyes to the fact that the parties also contemplated that the insured might be protected against a draft "otherwise" than by furnishing a substitute; but had they not done so, and were we able to see from the terms of their undertaking that the motives of the insurers were in every particular correct and unexceptionable, the fact would still remain, that whatever would have defeated the draft would have conduced to the benefit and protection of the insurers, so that the contract necessarily and effectually placed them in a position of antagonism to an important measure which the government in a time of war had resorted to in order to recruit its armies.

The thing insured against in this case, though an evil

to the individual, had been decided by the proper authorities to be needful for the country. Inasmuch as the law permitted a substitute to be enrolled, we must assume that when such enrollment should take place, the public interest would be subserved to the same extent as if the drafted man himself had been put into the ranks. But to procure a substitute would necessarily have cost the insurers a considerable sum of money, and they were consequently interested to the extent of such cost in whatever might effectually defeat the draft and save this expenditure. A riot which should terrify and drive off the enrolling officers, or by means of which the lists might be destroyed after the drawing had taken place; the flight or concealment of the drafted man; any fraud or deception which should baffle the officers in their attempt to make the draft effectual; a raid by the enemy, perhaps, which should paralyze, for the time being, the national authority of the district or drive off the able-bodied men; any thing, in short, which should defeat a conscription, would be the gain of the insurers; and if they did not favor it to the full extent of all that a substitute might cost them in the event of the insured person being drafted, it would be because their patriotism was sufficiently strong and active to overcome their selfishness. The patriotic impulses which ought at all times to inspire the citizen, and impel him to favor, support and assist the enforcement of the law, would necessarily, in the case of persons standing behind this contract, be opposed by strong pecuniary considerations, constraining them to sympathize with, and inviting them to favor, any occurrence or measure by means of which the conscription law might encounter embarrassment, and the person for whose protection they had undertaken escape its operation.

Insurance contracts in other cases are generally so framed as to make each party interested in doing that which is for

the public welfare, as well as for the individual good. The insurer against loss by fire, for instance, will take a risk upon property to the extent only of a part of its value, so that the hazard shall rest in part upon the insured also, who will be interested in preventing a loss if possible. All experience shows this to be wise policy, and the underwriter who should assume risks in excess of the value, would justly be looked upon as wanting in ordinary business prudence. However fair might be the reputation of the insured, all reasonable men would concede that it was, indiscreet and dangerous to contract with him on a basis which might quiet his vigilance and bribe his integrity by such pecuniary considerations, as might incline him to desire a loss to occur; and no person could be regarded as reasonably safe and prudent in the management of his affairs who should rely upon the vigilance and integrity of others to protect his interest where it apparently conflicted with their own. Upon what principle, then, can the state be called upon to lend its aid in enforcing a contract which enlists the interests of one of the parties in favor of embarrassing and defeating a measure of government of the highest importance,—one of a class that is never resorted to, except in the most serious emergencies, and when the safety of the republic seems absolutely to demand it? A single instance of such insurance might not lead to any very serious consequences, but if the contract is to be sustained in one case, it must have been legal in all, and these parties, had they seen fit, might have made such insurance a continuous business. To judge how the public interest might have been affected, we have only to suppose the citizens of the state generally to have made themselves parties to such contracts either as insurers or insured, and we cannot fail to perceive that the inevitable result must have been seriously to embarrass, if not wholly

defeat, any attempted conscription. A conscription is always an exceedingly harsh and repulsive measure, only to be justified by the most imperative reasons, and requiring the strong moral support of public opinion in order to its enforcement. With a general public sentiment against it, enforcement would be impossible, and such a sentiment would be half formed so soon as the citizens could see that the command of the law pointed in one direction and their private interests in another. Public opinion is not always fully and cordially united in favor of the vigorous prosecution of an existing war; and even when it is, citizens may still differ regarding the most suitable and efficient means to be employed for the purpose; and no obstacle could be interposed to the measures of government, which would be more serious and embarrassing than to strengthen the repugnance and fortify the doubts of those who disliked or distrusted its action, by showing them that what the law commanded, it was not for their personal interest should be done. When the call of one's country is most urgent, it must often happen that both inclination and the prospect of gain invite the citizen to evade it if possible, but the law cannot favor the voluntary establishment of a conflict between interest and duty, nor give its sanction to undertakings, the unavoidable tendency of which is to weaken the bonds of legal authority, and increase the difficulties which imperil the government, at the very moment when its needs are the greatest and most urgent. The private interest of parties liable to a draft is always apparently adverse to a conscription, and contracts of this description would create another class whose interests would also be hostile.

The law of insurance, as laid down by the courts, will present analogous cases of contracts adjudged void because contravening public policy. A wager policy, that is to

say, a policy upon a risk in which the insured has no interest is void, for the reason, among others, that it holds out continuously a strong temptation to the commission of crime in order to cause the loss upon which the insurance money is made payable.—*Sadler's Company v. Badcock*, 2 *Atk.*, 557; *Amory v. Gilman*, 2 *Mass.*, 1; *Adams v. Pennsylvania Ins. Co.*, 1 *Rawle*, 107. The case of insurance upon enemy's property in time of war is still more closely analogous. The insurers, in that case as in this, are by the contract placed in antagonism to the government of their country, and in a qualified sense become its enemies. The temptation to save themselves from pecuniary loss, perhaps from disaster and ruin, by thwarting the measures of government, is constant and powerful, and they must be men of extraordinary strength of will and purity of purpose if they do not find that the tie of allegiance and the sentiment of patriotism are weakened in the constant strain of interest, until they shall be ready to tolerate, if not actually to countenance, the open resistance or secret circumvention of the authorities. We do not question by this opinion the actual integrity and patriotism or the purity of motive on the part of the plaintiff and his associate insurer in this contract, but we think the law of the land will not favor arrangements by which even the best and purest of citizens are to try their fidelity by temptations of this nature. The judgment of the circuit court must be reversed, with costs, and a new trial awarded.

The other Justices concurred.