Filed 4/26/21 (unmodified opinion and prior 4/19/21 modification order attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| BROOKE WEXLER, | B303100 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19VECV00057) |
| v. | |
| CALIFORNIA FAIR PLAN ASSOCIATION, | **ORDER MODIFYING OPINION** |
| Defendant and Respondent. | [NO CHANGE IN JUDGMENT] |

THE COURT:

IT IS ORDERED that the opinion in the above-entitled matter filed on April 14, 2021, and modified on April 19, 2021, be modified as follows:

1. On page 4 of the majority opinion, in the first sentence of the third paragraph, replace "barebones" with "limited";
2. On page 17 of the majority opinion, delete the last sentence of the second full paragraph and replace as follows: "FAIR Plan's policy is basic to make insurance available and affordable to homeowners in high risk areas.";
3. On page 19 of the majority opinion, in the second sentence of the third full paragraph, delete: ", which is a tool insurance companies use to invalidate policies and to avoid paying claims".

There is no change in the judgment.

_____

GRIMES, Acting P. J.          STRATTON, J.          WILEY, J.

Filed 4/19/21 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| BROOKE WEXLER, Plaintiff and Appellant, v. CALIFORNIA FAIR PLAN ASSOCIATION, Defendant and Respondent. | B303100 <br><br> (Los Angeles County Super. Ct. No. 19VECV00057) <br><br> **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

IT IS ORDERED that the opinion in the above-entitled matter filed on April 14, 2021, be modified as follows:

On page 6 of the majority opinion, last paragraph, the last sentence is deleted: "In other words, the Talbots have abandoned their dispute with FAIR Plan."

The petition for rehearing filed by Appellant Brooke Wexler is denied.

There is no change in the judgment.

_____
GRIMES, Acting P. J.          STRATTON, J.          WILEY, J.

Filed 4/14/21 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| BROOKE WEXLER,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CALIFORNIA FAIR PLAN ASSOCIATION,<br><br>    Defendant and Respondent. | B303100<br><br>(Los Angeles County<br>Super. Ct. No. 19VECV00057) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Huey P. Cotton, Judge.  Affirmed.

Kerley Schaffer and Dylan L. Schaffer for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Raul L. Martinez, Elise D. Klein and Celia Moutes-Lee for Defendant and Respondent.

————————————

Brooke Wexler lived with her parents in their home. Her parents insured the place with a California FAIR Plan Association owner-occupied dwelling policy. Under "INSURED NAME," the FAIR Plan policy listed Wexler's parents James M. Talbot and Kimberly A. Talbot. FAIR Plan expressly disclaimed coverage for unnamed people. The policy does not name Wexler. Wexler sued FAIR Plan, not for breach of contract, but on bad faith insurance allegations only. The trial court sustained FAIR Plan's demurrer to Wexler's claim. We affirm.

I

Kimberly and James Talbot own a home in a mountainous area facing fire danger. They lived together with their seven-year-old son and their daughter Wexler, whose age is not in the record. The Talbots alleged smoke from the Woolsey wildfire damaged their home in 2018. They made claims on their home insurance policy with FAIR Plan.

The Legislature created FAIR Plan in 1968. FAIR Plan is a joint reinsurance association to give homeowners in high risk areas access to basic property insurance. (*California FAIR Plan Assn. v. Garnes* (2017) 11 Cal.App.5th 1276, 1283.)

Wexler, together with the Talbots, sued FAIR Plan on bad faith insurance allegations founded in their dissatisfaction with how FAIR Plan handled their claim of smoke damage to the home's contents. They attached FAIR Plan documents to their complaint and said these documents comprised the policy and its declarations. We describe these documents.

One page was on FAIR Plan letterhead. It lists the Talbots' address and policy number and is titled "IMPORTANT RENEWAL POLICY INFORMATION." This letter urged the Talbots to contact insurers to see if other insurance was available

2

in the standard market. "The FAIR Plan is an insurer of last resort and generally provides more limited coverage than does the standard market." The letter noted the insurance marketplace changes regularly, and so property not eligible for standard market coverage in the past may become eligible. The letter counseled the Talbots to ask neighbors and insurance brokers which insurance companies to use and urged the Talbots themselves to telephone insurance companies.

This letter told the Talbots carefully to consider their insurance needs and to shop around.

"If you cannot secure a policy with an insurance company operating in the standard market, you should talk to your broker about purchasing a Difference in Conditions (DIC) policy in addition to your FAIR Plan Dwelling Fire policy. A DIC policy can supplement your FAIR Plan policy by providing important coverages not in a FAIR Plan policy (e.g. theft, water damage and liability coverage)."

FAIR Plan advised the Talbots that "[s]electing the amount and type of insurance coverage appropriate for your needs is your responsibility. Do your best to make sure that your policy limits and coverages are sufficient to protect you in the event of a total loss."

"Check to see if your property is eligible for our dwelling replacement cost coverage, which is available at no additional charge. (This coverage does not increase your policy limits.)"

"For additional premium the FAIR Plan offers numerous other coverages that broaden or increase the insurance provided by our basic policy."

"Review the insurance we have issued to you to make sure it matches your needs as nearly as possible."

3

Another page stressed the limited extent of the FAIR Plan coverage as compared to more typical California homeowners insurance policies. This page has a comparison chart, which FAIR Plan cautioned was "NOT ALL-INCLUSIVE": "For a complete, specific understanding of all of the similarities and differences between the FAIR Plan dwelling policy and the insurance available in the standard market, you should consult with a licensed insurance broker."

This chart summarized the limited character of FAIR Plan's homeowner coverage. Unlike more typical California homeowners insurance policies, the FAIR Plan policy did not insure against *all* physical loss unless specifically excluded. That more typical approach yields comprehensive coverage. Rather, FAIR Plan's coverage was minimal: it insured the dwelling and its contents *only* against damage from fire, lightning, and internal explosion, with "limited" coverage for smoke damage. Somewhat broader coverage was optional. In contrast to a typical homeowners policy, the FAIR Plan policy offered *no* coverage for losses from theft, falling objects, weight of ice, snow, or sleet, water damage, freezing, or sudden accidental damage from artificially generated electrical current.

FAIR Plan's coverage was barebones in other ways as well. FAIR Plan emphasized it provided no liability coverage. It did not cover personal liability or damage to property of others, and it excluded medical payments for others. The chart also identifies other ways in which FAIR Plan's coverages, limits, and conditions were less favorable to the homeowner than would be a more typical homeowners policy.

A companion page, also on FAIR Plan letterhead, is titled "DWELLING INSURANCE POLICY DECLARATIONS." This

page says the transaction type is "Dwelling - Renewal Offer." It identifies the date of issue and the policy number. Under "INSURED NAME AND MAILING ADDRESS," this page listed James M. Talbot and Kimberly A. Talbot. It did not list Wexler, whose name does not appear in any FAIR Plan document concerning the policy.

Under "COVERAGES, LIMITS, PERILS AND PREMIUMS," this page identifies $686,446 as the coverage limit for the dwelling and $456,000 as the coverage limit for "Personal Property." This page does not define "Personal Property." That definition appears in a document titled "Dwelling Property Policy." We come to that document in a moment.

The next page is headed:

**"READ YOUR INSURANCE POLICY**

*Selecting the amount and type of insurance coverage appropriate for your needs is your responsibility.*"

At the bottom, this page states: "This policy is a contract between us and the Named Insured(s) and any loss payees identified on this Declarations Page. *This policy does not provide coverage to any person or entity not named here.*" The italics are ours.

As will appear, this last provision is important to our analysis. We call it the *no-coverage-for-unnamed-persons clause*. At oral argument, FAIR Plan's counsel reported this language is unique to its policies. We will return to it.

An additional policy page is headed as follows:

"California FAIR Plan Association
SCHEDULE OF ADDITIONAL INFORMATION."

This page again lists "INSURED NAME AND ADDRESS" and again lists James M. Talbot and Kimberly A. Talbot and their home address. Wexler's name does not appear.

The document entitled "Dwelling Property Policy" contained a section called "DEFINITIONS." This section contains this definition: "In this policy, 'you' and 'your' refer to the 'named insured' shown in the Declarations and the spouse if a resident of the same household."

The next page of "Dwelling Property Policy," with our italics, made this promise:

"If there is a checkmark next to C - Personal Property in the Declarations, the following applies:

"Coverage C – Personal Property

"We cover personal property usual to the occupancy as a dwelling and owned or used by you or *members of your family residing with you* while it is on the Described Location. At your request, we will cover personal property owned by a guest or household employee while the property is on the Described Location."

The Talbots' Declarations page has a check mark confirming they had personal property coverage.

Returning to the lawsuit, the trial court sustained FAIR Plan's demurrer to Wexler's claims, ruling she lacked standing to sue the insurer for bad faith. Wexler appealed.

The Talbots' claims are not at issue. Indeed, the Talbots asked the court to dismiss their complaint without prejudice after the trial court barred their daughter's claim. In other words, the Talbots have abandoned their dispute with FAIR Plan.

## II

Wexler lacks standing to sue FAIR Plan for bad faith.

### A

We independently review an order sustaining a demurrer. We take the facts as pleaded, but we disregard the legal conclusions, like whether the Talbots have an insurable interest in Wexler's property in the house. (See *Gulf Ins. Co. v. TIG Ins. Co.* (2001) 86 Cal.App.4th 422, 429 (*Gulf*).)

Despite special features, insurance contracts remain contracts to which ordinary contract interpretation rules apply. The fundamental goal of contract interpretation is to effectuate the parties' intention. Clear and explicit contractual language governs. This rule protects not subjective beliefs but objectively reasonable expectations. The court must interpret language in context, with regard to its intended function in the policy. (*Harper v. Wausau Ins. Co.* (1997) 56 Cal.App.4th 1079, 1085 (*Harper*).)

### B

We summarize some law concerning insurance bad faith.

Every contract, insurance or otherwise, imposes on each party a covenant of good faith and fair dealing in its performance and enforcement. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 (*Foley*).) Good faith logically subsumes fair dealing, so it is accurate and less redundant to call this implied covenant the duty of good faith.

Because the implied good faith duty is a contract term, compensation for its breach has *almost* always been limited to contract rather than tort remedies. (*Foley, supra*, 47 Cal.3d at p. 684.) We italicize *almost* because there is an exception to the general rule: insurance contracts. The landmark *Foley* decision

traced the development of and rationale for this judicial exception, which is that, against insurance companies, courts will enforce the duty of good faith with tort damages and not just contract damages. (See *id.* at pp. 684–690.)

These insurance cases were a major departure from traditional principles of contract law. (*Foley*, *supra*, 47 Cal.3d at p. 690.) Our Supreme Court has confined the reach of this insurance exception. The *Foley* decision held, for instance, that violations of the good faith duty in the employment context did not give rise to tort damages. (*Id.* at p. 663.) The court again fenced in the exception in *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 34–35 (*Cates*), which denied tort recovery to developers for a surety's breach of the good faith duty in a performance bond.

In developing the insurance exception that plaintiffs could enforce the good faith duty in tort, the Supreme Court for a time used the rubric of "special relationship." The idea was that the tort duty applied whenever a "special relationship" existed, as between an insurer and an insured. (See *Foley*, *supra*, 47 Cal.3d at pp. 685–691.) Yet the *Foley* court, when cabining the expansion of the insurance exception, quoted critics of the "special relationship" rubric. One quoted critic charged the "special relationship" rubric is illusory because it is but a label and it lacked a principled basis for decision. (*Id.* at p. 691.) Another quoted critic said this rubric fails because it is opaque, imprecise, incomplete, and unjustified. (*Id.* at p. 692.)

After these rebukes in *Foley*, the special relationship rubric disappeared in the later majority opinion in the *Cates* case. We thus speak no further of special relationships.

8

## C

Only one with the right to sue an insurance company for contract damages for breach of the insurance policy can also sue the insurance company for tort damages for breach of the covenant of good faith. Wexler cannot sue for bad faith because she had no contractual relationship with FAIR Plan. Wexler was not a *signatory*; she was not an *additional insured*; and she was not a *third party beneficiary*. We set forth these three separate analyses.

## 1

Wexler was not a *signatory* to the policy. The policy named her parents as the contracting parties. They are the signatories and the named insureds. Wexler is neither. Wexler was not a party to this contract.

This does not mean Wexler's things at her parents' house were uninsured. Nor does it mean the insurer gains some unfair advantage by collecting a premium to cover these items. They were insured—but by Wexler's parents and for her parents. FAIR Plan agrees it is on the hook for covered damage to Wexler's property in her parents' house. It is on the hook to her parents.

This policy states FAIR Plan will indemnify property owned by "members of your family residing with you." That is a benefit Wexler's parents enjoy. Her parents' benefit does not make Wexler a party to the contract.

Wexler points to additional language in this clause that states (with our italics):

"We cover personal property usual to the occupancy as a dwelling and owned or used by you or members of your family residing with you while it is on the Described

9

Location.  *At your request, we will cover personal property owned by a guest or household employee* while the property is on the Described Location."

This italicized wording does not aid Wexler.  This provision presumes "members of your family residing with you" will be in a familiar kind of long-term relationship with the named insured.  Extending coverage to possessions of family members living together benefits the policyholder and poses no adverse selection or moral hazard problem.  (Cf. *Davis v. Phoenix Ins. Co.* (1896) 111 Cal. 409, 415–416 (*Davis*) [example of moral hazard].)  Shortly we shall take up the topic of moral hazard at greater length.  The key point is no side has voiced any concern about the problem of moral hazard in this case.  That will prove significant.

The italicized sentence about guests and employees gave the Talbots a beneficial option to gain extended coverage for no extra charge.  This provision is logical and an advantage to the Talbots.  It does not assist Wexler.

2

Wexler was not an *additional insured* person under this particular policy.  FAIR Plan's no-coverage-for-unnamed-persons clause expressly disclaimed coverage for unnamed people like Wexler.

Other types of insurance policies can have different provisions.  Some policies indeed do expressly name classes of people as additional insureds.  We give two examples from cases Wexler cites.

First, a car insurance policy might define the insureds to be the contracting person, relatives of the contracting person, and *any other person the contracting person allows to drive* that car.  That was the situation, for instance, in the policy in *Northwestern*

10

*Mutual Insurance Co. v. Farmers' Insurance Group* (1978) 76 Cal.App.3d 1031, 1038 and footnote 2 (*Northwestern*). People you allow to drive your car—so-called "permissive users"—are additional insureds under that sort of policy.

A second example is *Cancino v. Farmers Insurance Group* (1978) 80 Cal.App.3d 335 (*Cancino*). Once again, a policy expressly included additional insureds. *Cancino* involved an auto policy that included unnamed people within its coverage by stating " '[i]nsured means (1) the named insured or a relative, (2) *any other person while occupying an insured motor vehicle . . . .*' " (*Id.* at p. 337, italics added.)

The Talbots' policy was different from these examples. The difference is the no-coverage-for-unnamed-persons clause.

Wexler notes she alleges in her amended complaint that she has standing because she "is an express insured under the Policy." The policy attached as an exhibit to her complaint and incorporated by reference provides otherwise, however, and the policy controls. (See *Hoffman v. Smithwoods RV Park, LLC* (2009) 179 Cal.App.4th 390, 400.)

Wexler therefore was not an insured, additional or express.

3

Wexler was not a *third party beneficiary* of the FAIR Plan contract.

California third party beneficiary law begins with Civil Code section 1559: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."

Civil Code section 1559 excludes enforcement of a contract by persons who benefit from the agreement in only an incidental or remote way. (*Lucas v. Hamm* (1961) 56 Cal.2d 583, 590

11

[section 1559 serves "to exclude enforcement by persons who are only incidentally or remotely benefited"]; *Harper*, *supra*, 56 Cal.App.4th at p. 1087 [" 'A third party should not be permitted to enforce covenants made not for his benefit, but rather for others. He is not a contracting party; his right to performance is predicated on the contracting parties' intent to benefit him.' "]; see also *Hartman Ranch Co. v. Associated Oil Co.* (1937) 10 Cal.2d 232, 244; *Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937, 944; accord, *Coleman v. Gulf Ins. Group* (1986) 41 Cal.3d 782, 794–795.)

Most recently our Supreme Court grappled with the law of third party beneficiaries in *Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 826–832 (*Goonewardene*). Writing for a unanimous court, Chief Justice Cantil-Sakauye upheld the trial court's order sustaining a payroll company's demurrer to an employee's wage and hour suit against her employer. The employee had named the payroll company, which performed payroll services for the employer. The *Goonewardene* decision ruled the employee was not a third party beneficiary of the contract between the employer and the payroll company. (*Id*. at pp. 832–834.)

The *Goonewardene* decision noted courts had "struggled" to formulate the doctrine of third party beneficiaries. (*Goonewardene*, *supra*, 6 Cal.5th at p. 828.) Indeed, few areas of contract law " 'have consistently raised more thorny theoretical and practical difficulties for lawyers, judges, and scholars than the rights of nonparties to enforce contractual promises.' " (*Ibid*., quoting Crawford, *Chief Justice Wright and the Third Party Beneficiary Problem* (1977) 4 Hastings Const. L.Q. 769, 771–772.)

For doctrinal assistance, the *Goonewardene* court turned to the pathbreaking article by the esteemed contract law scholar

12

Professor Melvin Eisenberg. (*Goonewardene*, *supra*, 6 Cal.5th at pp. 828, 830–832, citing Eisenberg, *Third-Party Beneficiaries* (1992) 92 Colum. L.Rev. 1358.)

The court set forth a three-part test. The test is this: carefully examine the express provisions of the contract at issue, as well as the relevant circumstances of contract formation, to determine not only (1) whether the third party would benefit from the contract, but also (2) whether a motivating purpose of the contracting parties was to provide a benefit to the third party, and (3) whether permitting a third party to bring its own breach of contract action against a contracting party would be consistent with the objectives of the contract and the reasonable expectations of the contracting parties. All three elements must be satisfied to permit the third party action to go forward. (*Goonewardene*, *supra*, 6 Cal.5th at p. 830.)

Under this governing formulation, there are two reasons why Wexler is not a third party beneficiary of the contract between FAIR Plan and the Talbots.

First, Wexler cannot show a motivating purpose of the contracting parties was to benefit her. (See *Goonewardene*, *supra*, 6 Cal.5th at p. 830.) Knowing a benefit may flow to Wexler is not enough. (*Ibid.*) The contracting parties were her parents and the insurance company. If a motivating purpose of the contracting parties had been to benefit Wexler, the policy would not have included the no-coverage-for-unnamed-persons clause or it would have named Wexler. This clause expressly negates what Wexler seeks.

Second, permitting a bad faith action by Wexler also is unnecessary to effectuate the insurance contract's objectives. The Talbots can sue—indeed, here did sue—regarding FAIR Plan's

13

handling of the family's insurance claim, a claim Wexler alleges, and FAIR Plan acknowledges, does cover Wexler's personal property. (See *Goonewardene*, *supra*, 6 Cal.5th at pp. 830 & 836 [no third party right to enforce contract if unnecessary to effectuate the contract's objectives].) As mentioned, FAIR Plan agrees it is on the hook to Wexler's parents for covered damage to Wexler's property. It agrees it must uphold its promise to the Talbots to pay for this damage. If Wexler has any real dispute, it is with her parents and fellow plaintiffs, the Talbots. Yet the same lawyer represents Wexler and the Talbots, and the papers contain no hint of acrimony within this family.

Wexler is not a third party beneficiary. Even if we had doubts regarding Wexler's status—which we do not—we would resolve them against Wexler. (See *Shaolian v. Safeco Ins. Co.* (1999) 71 Cal.App.4th 268, 275 (*Shaolian*) [courts resolve doubts against the existence of a third party beneficiary].)

In sum, Wexler cannot sue for bad faith because she was not a named signatory, not an additional insured, and not a third party beneficiary. She lacked a contractual relationship with FAIR Plan and so lacked standing.

C

Wexler claims she must be allowed to proceed because the policy is ambiguous, and we are to construe ambiguities against the insurer: on one hand, the policy extends coverage to her possessions in her parents' home, and the Declarations page confirms the personal property coverage; on the other hand, that same page contains the no-coverage-for-unnamed-persons clause.

These provisions are unambiguous. They afford coverage to the Talbots—and only the Talbots—for the specified contents in

14

their home, including contents owned or used by family members residing there.  The no-coverage-for-unnamed-persons clause does not absolve FAIR Plan of its duty to cover this property.

D

Wexler incorrectly claims precedent supports her.  We survey her six citations.

1

*Hatchwell v. Blue Shield of California* (1988) 198 Cal.App.3d 1027, 1029 held a spouse who was not a party to an insurance contract *lacked* standing to bring a bad faith action for wrongful denial of benefits to her insured husband.  This holding supports FAIR Plan, not Wexler.

2

*Northwestern*, *supra*, 76 Cal.App.3d at page 1038 and footnote 2 concerned an auto policy that *included* the disputed person as an additional insured because that person was both a permissive user and a relative—two statuses that were material in that case.  By contrast, the no-coverage-for-unnamed-persons clause here *excludes* additional insureds.  The *Northwestern* holding is irrelevant.

3

*Cancino*, *supra*, 80 Cal.App.3d 335 concerned an insurance policy that expressly identified a category of additional insureds.  As noted, the *Cancino* policy covered "*any other person while occupying an insured motor vehicle*."  (*Id.* at p. 337, italics added.)  The no-coverage-for-unnamed-persons clause in this case distinguishes it from the *Cancino* policy.  *Cancino*'s holding does not apply here.

To rephrase this point, *Cancino* "recognized a distinction between the 'parties' to the insurance contract—who will

15

generally also be named insureds—and 'insureds' who are neither parties to the insurance contract nor specifically named therein. A person can be deemed an 'insured' by virtue of fitting into an expressly defined category of those for whose benefit the policy was created. This distinction does not assist [Wexler]." (*Seretti v. Superior Nat. Ins. Co.* (1999) 71 Cal.App.4th 920, 928–929 (*Seretti*).)

Wexler was neither a party to the insurance contract nor an additional insured. *Cancino* does not support Wexler's cause.

4

*Harper*, *supra*, 56 Cal.App.4th 1079 concerned a fundamentally different insurance policy from the one here. *Harper* involved a broad commercial policy that insured generally against liability, not a limited owner-occupied dwelling policy of last resort that insured against only fire, lightning, internal explosions, and, to a limited degree, smoke. (*Id*. at p. 1083.)

The *Harper* policy provided liability protection for a corporation called L.A. City Tower, Inc. Geneva Harper slipped and fell outside L.A. City Tower. Harper sued L.A. City Tower, which prevailed because Harper could not establish it reasonably could have discovered the dangerous condition. Harper then sued Wausau Insurance Company, a subsidiary of which sold L.A. City Tower insurance extending medical coverage to people who suffered bodily injury "[o]n ways next to premises you own or rent . . . . We [Wausau] will make these payments *regardless of fault*." The only *exclusion* from this coverage was people employed by or connected to L.A. City Tower. (*Harper*, *supra*, 56 Cal.App.4th at p. 1084, italics added; *id*. at pp. 1082–1084.)

The *Harper* court confronted an open issue in California where the authority from other jurisdictions was split. (*Harper*,

16

*supra*, 56 Cal.App.4th at p. 1089.) The difficulty that divided the authorities was that an injured person (there, Harper) was asking the courts to find the insured's liability insurer liable when the insured itself was not liable. This might seem paradoxical. But the *Harper* court quoted an insurance law treatise explaining the purpose of this particular policy language was to create a fund so injured people could recover. (*Id*. at p. 1090.) This same treatise also noted, however, that insurers *could* limit coverage so as to make it inapplicable to activities away from the premises or as to persons not on the premises, if not injured by an act of the insured. (*Shaolian*, *supra*, 71 Cal.App.4th at p. 273.) So the result would depend on how the insurance policy was written.

Here the insurance policy was written in a decisively different way from the *Harper* policy. The *Harper* policy extended medical payment coverage to people injured while walking by the insured's premises, without regard to whether the insured was to blame. That coverage was broad. FAIR Plan's coverage, by contrast, is narrow. It has no liability or medical payments coverage. And coverage is limited to people named in the policy. Wexler is not named. Wexler is not covered.

FAIR Plan's slender coverage makes sense. By design, FAIR Plan is an insurer of last resort. To make basic insurance available and affordable to homeowners in high risk areas, FAIR Plan is barebones.

In sum, the *Harper* holding does not support Wexler because the policy here is nothing like the one in *Harper*.

5

In a string cite in a footnote and without further comment, Wexler cites *San Diego Housing Commission v. Industrial*

17

*Indemnity Co.* (1998) 68 Cal.App.4th 526, which held a bad faith cause of action should not have gone to the jury. (*Id.* at pp. 532, 544–545.) This holding is not germane.

6

Wexler cites a provision of a treatise, which in turn cites one case. This provision reads as follows:

"Privity of contract with the insurer is essential to an implied covenant action against the insurer. Thus, persons entitled to benefits under a policy have standing to sue for bad faith if those benefits are wrongfully withheld. This includes the contracting parties (persons named as insureds) as well as others entitled to benefits as 'additional insureds' or as express beneficiaries under the policy. But persons *not* entitled to benefits under a policy cannot maintain an implied covenant action . . . ." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2020) ¶ 12:55 (Rutter Group), citing *Seretti, supra,* 71 Cal.App.4th at p. 929.)

This treatise provision supports FAIR Plan. When the treatise states persons entitled to benefits have standing to sue, those persons are the Talbots. The treatise continues that the group with standing "includes the contracting parties (persons named as insureds) as well as others entitled to benefits as 'additional insureds' or as express beneficiaries under the policy." (Rutter Group, *supra,* at ¶ 12:55.) As we have explained, Wexler is neither an additional insured nor a third party beneficiary. Wexler lacks standing.

Additionally, the cited *Seretti* holding went the wrong way for Wexler. (See *Seretti, supra,* 71 Cal.App.4th at p. 931 ["In accordance with the overwhelming weight of authority, we affirm the trial court's ruling on appellants' *lack of standing* as

18

shareholders to assert a claim against the corporation's insurer" (italics added)].)

In logic as well as holding, *Seretti* is contrary to Wexler's case. The logic of the *Seretti* opinion was that the plaintiffs lost because they "were not parties to the insurance contract; they were not specifically named insureds; and to the extent they fit into the general category of those for whom the policy was created to benefit—employees, officers, and directors of Post Sound—*they were specifically excluded.*" (*Seretti, supra,* 71 Cal.App.4th at p. 929, italics added.) The no-coverage-for-unnamed-persons clause specifically excluded Wexler from the Talbots' policy in precisely the same way.

E

Wexler's complaint pleaded her parents had no insurable interest in the property she had in their house. We disregard legal conclusions in a complaint; they are just a lawyer's arguments. (See *Gulf, supra,* 86 Cal.App.4th at p. 429.) Whether an interest is insurable is a question of law. (See Ins. Code, § 281 [giving legal definition of insurable interest].)

Wexler's position on insurable interest is all wrong. She urges an unprecedented and incorrect expansion of the insurable interest doctrine, which is a tool insurance companies use to invalidate policies and to avoid paying claims. A sound view of this legal doctrine reveals the Talbots *obviously* had an insurable interest in Wexler's property in their home. It is perverse for Wexler as a plaintiff to suggest otherwise, for expanding this doctrine would hurt claimants like her to the advantage of insurance companies everywhere.

Wexler cites no case squarely on point. The California precedents we have found go against Wexler. (See, e.g., *State*

19

*Farm Mutual Automobile Ins. Co. v. Price* (1966) 242 Cal.App.2d 619, 624 [mother had insurable interest in son's car]; *Osborne v. Security Ins. Co.* (1957) 155 Cal.App.2d 201, 204–206 (*Osborne*) [same].)

Many decisions from other jurisdictions also go against Wexler. (See, e.g., *Georgia Mutual Ins. Co. v. Nix* (Ga.Ct.App. 1966) 113 Ga.App. 735, 737 [149 S.E.2d 494, 496] [father has insurable interest in son's car]; *MemberSelect Ins. Co. v. Flesher* (Mich.Ct.App. 2020) 332 Mich.App. 216, __ [__ N.W.2d __, __] [2020 WL 1968631 at *6] (*MemberSelect*) [parent's interest in adult child's welfare creates an insurable interest]; *Hedrick v. Kelley* (Mo.Ct.App. 1987) 734 S.W.2d 529, 532–533 (*Hedrick*) [rejecting insurer's insurable interest argument where mother and daughter lived in same house]; *Stauder v. Associated General Fire Co.* (Ohio Ct.App. 1957) 105 Ohio App. 105, 108–110 [151 N.E.2d 583, 585–586] [father had an insurable interest in children's clothing]; cf. *Central Manufacturers' Mutual Ins. Co. v. Friedman* (Ark. 1948) 213 Ark. 9, 11–14 [209 S.W.2d 102, 103–104] [father prevails against insurance company concerning loss of son's property]; *Balzer v. Globe Indemnity Co.* (N.Y. 1924) 206 N.Y.S. 777, 778–779 [211 A.D. 98, 99–101] [son recovers on his policy for theft of mother's jewelry]; but see *Sayah v. Metropolitan Property & Casualty Ins. Co.* (Neb. 2007) 273 Neb. 744, 747–749 [733 N.W.2d 192, 196] [parents had no insurable interest in son's car].)

None of these holdings is on all fours. We therefore look to the purpose of the doctrine to guide our thinking.

At the outset, we summarize our analysis of statutory purpose. The insurable interest doctrine aims to *suppress gambling* and to *curb moral hazard* by refusing to enforce

insurance policies that are contrary to public policy. But nothing about the circumstances of this case suggests that the Talbots were *gambling*: that they bought the FAIR Plan policy to *increase* their personal risk, the way a gambler does when chancing a bet in Las Vegas. Nor is there a reason to fear *moral hazard*. The outlandish notion the Talbots might burn their daughter's home-stored property to collect an insurance payoff has no support. Lacking any relevance in purpose, then, the insurable interest doctrine does not invalidate the Talbots' insurance contract as contrary to public policy. To the contrary, California public policy strongly supports this kind of insurance for California families living in areas exposed to wildfire. In sum, the insurable interest doctrine entirely favors the trial court result, which we affirm.

We now explain more fully. In doing so, we inspect the foundations of a doctrine one scholar calls "erratic, ambiguous, and inconsistent." (Loshin, *Insurance Law's Hapless Busybody: A Case Against the Insurable Interest Requirement* (2007) 117 Yale. L.J. 474, 487 (*Hapless Busybody*).) We seek, not a new understanding, but knowledge of the original basis for the doctrine and thus of the legislative intent behind our old California statute.

The insurable interest doctrine is venerable: its taproot goes deep into the earth of English common law. The place to start is 18th century London.

In Georgian England, people needed no connection to some ship or celebrity to buy insurance on ships or celebrities. This common law freedom led to unadorned gambling. Imagine, for instance, buying life insurance on Jane Austen or Henry Fielding, during their lifetimes, just as a lark. Or perhaps it would be fun

to buy an accident policy on some ocean vessel.  In revulsion, Parliament passed statutes in 1746 and 1774 to outlaw "gaming or wagering" of this sort.  Thus was born the doctrine of insurable interest.  (*Hapless Busybody*, *supra*, at pp. 479–480; cf. *Amory v. Gilman* (Mass. 1806) 2 Mass. 1, 3–6 [describing common law and Parliament's reaction].)

Long ago, the United States imported the insurable interest doctrine from England.  Massachusetts took this step in 1815.  (See *Lord v. Dall* (Mass. 1815) 12 Mass. 115.)  Pre-*Erie*, the Supreme Court of the United States also adopted and continued developing the doctrine as federal common law.  (E.g., *Grigsby v. Russell* (1911) 222 U.S. 149, 155, 156, 157 (*Grigsby*) (Holmes, J.) [referring to English law].)

California passed its version of the insurable interest doctrine in 1872 by adding section 2546 to the Civil Code, which our Legislature recodified in 1935 as section 281 of the Insurance Code.  (See Stats. 1935, ch. 145, p. 503.)

So the source of law for our decision today is section 281 of the Insurance Code, which is a century and a half old.

This California statute defines insurable interest:  "[e]very interest in property, or any relation thereto, or liability in respect thereof, of such a nature that a contemplated peril might directly *damnify* the insured, is an insurable interest."  (Ins. Code, § 281, italics added.)

A dictionary definition of "damnify" is "to cause loss or damage to."  (The Random House Dictionary of the English Language (2d ed. unabridged 1987) p. 504.)  What kind of loss counts?  The law of insurance can comprehend what every parent understands.  (Cf. *MemberSelect*, *supra*, 2020 WL 1968631 at *5–

*6 ["the interest of a parent in an adult child's welfare" means the child's "loss" creates an insurable interest for the parent].)

When construing this statute, our job is to effectuate its purpose.  (E.g., *Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 135.)  "The dominant mode of statutory interpretation over the past century has been one premised on the view that legislation is a purposive act, and judges should construe statutes to execute that legislative purpose.  This approach finds lineage in the sixteenth-century English decision *Heydon's Case*, which summons judges to interpret statutes in a way 'as shall suppress the *mischief*, and advance the *remedy*.' "  (Katzmann, Judging Statutes (2014) p. 31, italics added.)

The insurable interest doctrine aims to suppress two mischiefs:  *gambling* and *moral hazard*.  Gambling has a common meaning; it needs no further explanation at the moment, although we do return to it.  Moral hazard is more arcane; we define it shortly.

We know about these twin goals from the old case law on insurable interests.  The Supreme Court of the United States, in its first insurable interest decision, wrote that, for all valid life insurance policies, "there must be a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of *blood* or affinity, to expect some benefit or advantage from the continuance of the life of the assured.  Otherwise the contract is *a mere wager,* by which the party taking the policy is *directly interested in the early death of the assured."* (*Warnock v. Davis* (1882) 104 U.S. 775, 779, italics added.)

This final sentence identifies the twin goals.  *Warnock*'s "mere wager" language condemned *gambling*, while its fear of a

23

"direct" interest favoring "the early death of the assured" was aversion for *moral hazard*.

Moral hazard is the incentive that insurance can give an insured to increase risky or destructive behavior covered by the insurance. (E.g., *May Dept. Stores Co. v. Federal Ins. Co.* (7th Cir. 2002) 305 F.3d 597, 601 (Posner, J.) [abrogated on other grounds by *Americold Realty Trust v. ConAgra Foods, Inc.* (2016) __ U.S. __ [136 S.Ct. 1012], as recognized in *RTP LLC v. ORIX Real Estate Capital, Inc.* (7th Cir. 2016) 827 F.3d 689, 691–692].)

Economists began writing about "moral hazard" in the 1960s, and this usage has gained currency since then. (Baker, *On the Genealogy of Moral Hazard* (1996) 75 Tex. L.Rev. 237, 237–238, 267–268, 272–275.) The phrase is useful here; it precisely encapsulates the relevant meaning.

A classic illustration of moral hazard is the novel Double Indemnity, first published in 1936. James M. Cain painted this hazard in his Los Angeles noir masterpiece: the corrupt insurance salesman falls for an unhappy wife, and the two plot against her unloved and well-insured husband. Cain wrote for the ages: "there's many a man walking around today that's worth more to his loved ones dead than alive, only he don't know it yet." (Cain, Double Indemnity (Vintage Books 1978) p. 11.)

The malign incentive of moral hazard is not just fiction. The cases prove it. (E.g., *Ramey v. Carolina Life Ins. Co.* (S.C. 1964) 244 S.C. 16 [135 S.E.2d 362] (*Ramey*) [wife insures husband's life without his knowledge and then gives him arsenic]; cf. *O'Hara v. Carpenter* (Mich. 1871) 23 Mich. 410, 415 ["all reasonable men would concede that it was indiscreet and dangerous to contract with him on a basis which might quiet his

24

vigilance and bribe his integrity by such pecuniary considerations, as might incline him to desire a loss to occur"].)

Thus the insurable interest rule:  no insurance policy can be allowed to create a profitable temptation to commit murder or other wrongdoing.  A contrary rule would open " ' "a wide door by which a constant temptation is created to commit for profit the most atrocious of crimes." ' " (*Ramey*, *supra*, 244 S.C. at p. 27 [135 S.E.2d at p. 367], italics omitted.)

The logic of this rule is national.  Together with sister states, California subscribes to it.  (See *Davis*, *supra*, 111 Cal. at p. 416 ["To permit such a recovery would greatly tend to the destruction of like property under like circumstances, and open the door and tempt men to enter therein for fraudulent purposes."].)

With his signature style and his penetrating insight, Justice Holmes likewise drove home these two goals:  suppress moral hazard and discourage wagering.  Holmes wrote that "[a] contract of insurance upon a life in which the insured has no interest is a *pure wager* that gives the insured a *sinister counter interest in having the life come to an end*." (*Grigsby*, *supra*, 222 U.S. at p. 154, italics added.)

Holmes elaborated.

Concerning moral hazard, Holmes explained the evil of inducing a potential murderer to collect life insurance by taking someone else's life.  To allow a recovery like that "may prove a sufficient motive for crime [that] is greatly enhanced if the whole world of the unscrupulous are free to bet on what life they choose." (*Grigsby*, *supra,* 222 U.S. at p. 155.)

Concerning gambling, Holmes observed English authorities created the doctrine because "such wagers came to be regarded as

a mischievous kind of gaming." (*Grigsby*, *supra*, 222 U.S. at p. 156.)

Gambling suppression was and remains a traditional objective of the insurable interest doctrine in California. (See *Osborne*, *supra*, 155 Cal.App.2d at p. 205 ["The object to be obtained by this rule, the reason for its being, is avoidance of wagering contracts."].)

In sum, twin goals steer the insurable interest doctrine. To repress gambling and to arrest moral hazard, the insured must have an insurable interest in the object of the insurance contract—or else the insurable interest doctrine bars enforcing the contract as contrary to public policy.

This fundamental understanding of the insurable interest doctrine makes it plain the Talbots had an insurable interest in Wexler's property stored in their house while Wexler lived there with them.

The Talbots were not gambling. They did not buy the FAIR Plan policy as some casino opportunity, the way someone in 1956 might have tried to buy life insurance on Elvis right after his big Ed Sullivan show. Rather, the Talbots shared the quotidian and legitimate insurance interest of tapping into a pool and using the law of large numbers to *reduce* personal risk. The transaction beneficially reduced social risk as a whole. (See Posner & Weyl, *An FDA for Financial Innovation: Applying the Insurable Interest Doctrine to Twenty-First-Century Financial Markets* (2013) 107 Nw. U. L.Rev. 1307, 1308–1319, 1322–1323.) This insurance policy was a social good, not a social bad.

Neither did the Talbots' policy create moral hazard. The Talbots did not propose to FAIR Plan that it should extend coverage for their daughter's belongings. This was FAIR Plan's

idea.  It was on FAIR Plan's form policy.  No one suggests the Talbots bought this policy to game the system in the hopes of destroying their daughter's things for an insurance check.  (See *Hedrick*, *supra*, 734 S.W.2d at p. 533 [the term insurable interest should be broadly construed when close family members reside in the same house and the policy was obtained in good faith].)

There is irony to Wexler's misunderstanding of the insurable interest doctrine.  The doctrine is a defense to benefit insurance companies against policyholders' claims.  (Ins. Code, § 280 ["If the insured has no insurable interest, the contract is void."]; *Jenkins v. Hill* (1939) 35 Cal.App.2d 521, 524; see also *Countrywide Home Loans, Inc. v. Tutungi* (1998) 66 Cal.App.4th 727, 732; Rutter Group, *supra*, at ¶ 6:202 [the insurer is the only party that may challenge whether the insured has an insurable interest].)

The effect of Wexler's attempted expansion, if successful, would have been to disadvantage policyholders in other disputes.  Insurance companies would gain.  Wexler's position on insurable interest is paradoxical.  It is also incorrect as a matter of law.

Wexler cites the *Davis* case, which concerned a plaintiff who possessed property under a contract for which he had in part paid the purchase price, and which upon his completion of the contract would entitle him to a conveyance of the legal title.  This enjoyment and expenditure gave him an insurable interest in the property.  (*Davis*, *supra*, 111 Cal. at p. 414.)  It is not apparent how this holding pertains to this case.

Wexler also cites *Burns v. California FAIR Plan Association* (2007) 152 Cal.App.4th 646, 654, which held the holder of a life estate and the holder of the remainder interest could not *both* recover the full value of the insured house that

burned down.  That would be double recovery.  Each holder indeed did have an insurable interest in the house.  (*Id.* at p. 652.)  But that conclusion did not imply the insurers were liable for more than the full value of the house:  "the nature of insurance does not provide for recovery in excess of the value of the property destroyed where there is but one loss."  (*Id.* at p. 653.)  This case has no issue about double recovery.  The *Burns* holding has no bearing on this appeal.

Wexler cites another holding with no relation to this case, *California Food Service Corp. v. Great American Insurance Co.* (1982) 130 Cal.App.3d 892, 896–897.  The decision held a binding letter of intent gave a buyer an insurable interest in restaurant premises damaged by fire.

In conclusion, Wexler lacks standing to sue FAIR Plan for bad faith.

## III

Wexler bore the burden of showing it is reasonably possible she can amend her complaint to state a cause of action.  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)  Wexler did not brief this issue on appeal and thereby forfeited it.  And in the trial court, Wexler simply stated she should be afforded leave to amend without making any showing on this point.  The trial court properly sustained the demurrer to Wexler's cause of action without leave to amend.

## DISPOSITION

We affirm the judgment and award costs to California FAIR Plan Association.

WILEY, J.

I CONCUR:


GRIMES, Acting P. J.

**Stratton, J., Dissenting.**

Everyone check your homeowners insurance policy. Be especially vigilant if you live in the quarter of California households which are multigenerational, or are one of the 40 percent of California parents whose adult children have moved back home. Those other adults in your household have probably accumulated personal property of their own. According to the majority, if you, as the homeowner and a named policyholder, try to protect your family members by paying a premium for a policy that purports to provide coverage for the personal property of resident family members, you are benefitting the insurance company, not your family members. If your family member's personal property is damaged, you will not be able to recover for that damage because you do not have an ownership interest in that property. Your family member will not be able to recover because the insurance company, which did not request or require you to identify the family member by name, will be able to deny coverage because you did not identify the family member by name. The insurance company gets to keep your premiums, which is a pretty sweet deal for the insurer but not for you or your family member.

Here the Talbots and their adult daughter Brooke Wexler alleged the Talbots purchased a fire insurance policy that expressly insured against damage to and loss of possessions of other resident family members. Wexler was residing at the property when the Woolsey fire blew through the neighborhood, causing smoke damage to the Talbots' and Wexler's possessions.

1

The Talbots and Wexler each made claims against the policy for damage to their respective possessions.[1] Insurer FAIR Plan disallowed both claims. The First Amended Complaint (FAC) alleges FAIR Plan denied their claims for smoke damage based on the opinion of defendant SGD, an outside adjusting firm which is neither a licensed contractor nor qualified to determine the extent of fire damage to a California dwelling or the appropriate method of repairs in the event of fire damage.

As a result, the Talbots and Wexler sued FAIR Plan and SGD, alleging, among other things, breach of the covenant of good faith and fair dealing. The FAC alleges that Wexler had an insurable interest in personal property which was damaged or destroyed by the Woolsey fire. It also alleged the Talbots had no insurable interest in Wexler's damaged personal property. The FAC alleges "Wexler is an express insured under the Policy and as such has standing to sue FAIR Plan for breach of the implied covenant of good faith and fair dealing."

The majority allows the Talbots to proceed with their cause of action against the insurer, but bars Wexler from proceeding with hers because she is neither an insured nor a beneficiary of the policy. In effect, the majority says, "Don't worry, the Talbots can enforce the policy on behalf of Wexler." To say Wexler is neither an insured nor a beneficiary of the policy ignores the express language of the insurance policy and turns insurance law on its head.

First, the majority states the policy expressly limits coverage to the named insureds only. I disagree. The policy

---

[1]     The parties have not challenged Wexler's capacity to sue as an adult.

2

expressly *provides* coverage to resident family members who have personal property located in the premises which are the subject of the policy. The majority relies on the Declarations page to support its mistaken conclusion that the policy itself limits coverage. Preliminarily, the majority is correct that at the beginning of the Declarations page, the Policy lists the named insureds: James M. Talbot and Kimberly A. Talbot. At the end of the Declarations page is this statement: "This policy is a contract between us and the Named Insured(s) and any loss payees identified on this Declarations Page. This policy does not provide coverage to any person or entity not named here."

The Declarations page, which displays a chart for "Coverages, Limits, Perils and Premiums." Section C under "Selected Coverages" sets a limit of $456,000 for coverage of personal property. There is also a box for a checkmark next to each category of items eligible for coverage. The box next to personal property is checked. Thus the Declarations page has expanded the homeowner's coverage to include personal property and has done so before the disclaimer at the end of the page.

The scope of covered personal property is defined in the policy itself (or, as FAIR Plan entitled it, the "Agreement"), which follows the Declarations page. Under "Agreement," it states, "We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy." It continues, "If there is a checkmark next to C-Personal Property in the Declarations, the following applies: We cover personal property usual to the occupancy as a dwelling and owned or used by you or members of your family residing with you while it is on the Described Location. At your request, we

will cover personal property owned by a guest or household employee while the property is on the Described Location."

Under long-standing California law, "A person can be deemed an 'insured' by virtue of fitting into an expressly defined category of those for whose benefit the policy was created." (*Seretti v. Superior Nat. Ins. Co.* (1999) 71 Cal.App.4th 920, 928-929, relying on *Cancino v. Farmers Ins. Grp.* (1978) 80 Cal.App.3d 335.) The Talbots' policy provision contains just such an express category of persons who benefit from the policy—resident family members with personal property on the premises—and Wexler is just such a person.

The majority nevertheless holds that the disclaimer of coverage at the end of the Declarations page trumps expansion of coverage on the same page and requires that a resident family member be identified by name to be covered for the loss of her personal property. I disagree. At most it creates an ambiguity. When the Declarations page does not purport to define or set forth the operative terms of a policy provision, "any ambiguity 'is resolved by' the terms of the policy." (*Hervey v. Mercury Casualty Co.* (2010) 185 Cal.App.4th 954, 965; accord *George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1129.)[2] Thus, if the bare use of the phrase "personal property" on the Declarations page creates an ambiguity about whose personal property is covered, it is resolved by the terms of the policy itself,

---

[2]     More generally, ambiguities are to be resolved against the insurer. "The 'tie-breaker' rule of construction against the insurer stems from the recognition that the insurer generally drafted the policy and received premiums to provide the agreed protection. (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321.)

which expressly provides coverage for resident family members who have personal property on the premises. Therefore, I would hold Wexler is an insured for purposes of personal property coverage.

The majority is unconcerned with Wexler's inability to assert her own interests because it mistakenly believes that the Talbots can recover on behalf of Wexler. The Talbots cannot make a claim to recover the value of Wexler's property unless they suffered a pecuniary loss because of the damage. The FAC alleges they have no insurable interest in Wexler's property.[3] It is bedrock California insurance law that "No person may recover on a policy of insurance unless that person has an insurable interest in the property insured." (*California Food Service Corp. v. Great American Ins. Co.* (1982) 130 Cal.App.3d 892, 897.) Indeed, our Insurance Code provides: "If the insured has no insurable interest, the contract is void." (Ins. Code, § 280.) The

---

[3]     Notably the majority calls this allegation a "legal conclusion" it can ignore. If the FAC had quoted the statutory definition of "insurable interest" set out in Insurance Code section 281 ("Every interest in property, or any relation thereto, or liability in respect thereof, of such a nature that a contemplated peril might directly damnify the insured, is an insurable interest."), would that have been sufficient? It sounds like the majority wants the FAC to restate in plain language what insurable interest means—to wit, the insured had an ownership interest in the property, damage to which resulted in a direct and certain pecuniary loss. (*Alexander v. Security-First Nat. Bank of Los Angeles* (1936) 7 Cal.2d 718; *Burns v. California FAIR Plan Assn.* (2007) 152 Cal.App.4th 646, 651.) If that is a real problem, Wexler should be given an opportunity to amend her complaint.

Code provides further that the parties cannot agree otherwise: "Every stipulation in a policy of insurance for the payment of loss whether the person insured has or has not any interest in the property insured, or that the policy shall be received as proof of such interest, is void." (Ins. Code, § 287.) There is nothing in the FAC to support the majority's belief that Wexler's personal property is "family property" and so the Talbots can recover for its loss. To analyze around the concept of insurable interest is not only strained, but it ignores a keystone of California insurance law. The current definition of insurable interest is clear and does not turn on the insured's intent. Nor can it be reasonably understood to protect only the insurer. As the majority acknowledges by way of example, the ability to insure against the death of another person can put that person in danger of being killed for insurance proceeds.

In sum, FAIR Plan has charged the Talbots a premium for personal property coverage for family members which the Talbots cannot pursue because they lack an insurable interest; it then has argued that the owner of the personal property cannot seek recovery herself. The majority sees no problem with this. I do. (See Ins. Code, § 790.03, subd. (h)(1) [an unfair business practice is "Misrepresenting to claimants pertinent facts or insurance policy provisions relating to any coverages at issue."].) That FAIR Plan may have told the Talbots to read the entire policy is not a substitute for explaining that the disclaimer at the end of the Declarations page absolves it of coverage expressly provided for in the policy itself. (See *Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1211 [" 'Precision is not enough. Understandability is also required.' "].)

Nevertheless, if Wexler is not an insured, she is a third party beneficiary of the contract. The majority's second holding that Wexler did not satisfy the three-factor test for determining whether a party is a third party contract beneficiary is too narrow. *Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817 (*Goonewardene*) is our Supreme Court's most recent explanation of the third-party beneficiary doctrine. There are still three elements to the doctrine: "(1) whether the third party would in fact benefit from the contract, . . . (2) whether a motivating purpose of the contracting parties was to provide a benefit to the third party, and (3) whether permitting a third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties." (*Id.* at p. 830.)

It is indisputable Wexler would benefit from the contract under the allegations of the FAC. She would receive recompense for the damage to her property. As to the second factor, "motivating purpose" is a new term, but the *Goodewardene* Court explains that "this opinion uses the term 'motivating purpose' in its iteration of this element to clarify that the contracting parties must have a motivating purpose to benefit the third party, and not simply knowledge that a benefit to the third party may follow from the contract. To avoid any possible confusion, however, we emphasize that our intent-to-benefit caselaw remains pertinent in applying this element of the third party beneficiary doctrine." (*Goodewardene, supra,* 6 Cal.5th at p. 830.)

One of the cases cited with approval in *Goodewardene* on the intent-to-benefit standard is *Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937. This case is useful as it explains: "A third party beneficiary may enforce a contract expressly made for his

7

benefit. (Civ. Code, § 1559.) And although the contract may not have been made to benefit him alone, he may enforce those promises directly made for him." (*Murphy*, at p. 943.) This certainly suggests that resident family member coverage is not voided just because its addition to the contract may not have been the primary motivation of the named insureds. The provision is express and under *Murphy*, Wexler would have the right to enforce it.

Factually, any assumptions about whether the Talbots had a motivating purpose to benefit Wexler are not based on any allegations in the complaint, which control on a demurrer. There are no allegations in the FAC that the Talbots "decided" not to include Wexler's name. The majority refers to the insurance policy itself, which shows Wexler is not a named insured, but that fact does not reveal the Talbots' motivation or thought processes. Even assuming Wexler's name could somehow have been added to the policy, it would be a question of fact as to why the Talbots did not add it. Given the express coverage language, why would they have believed they needed to add her name? She perfectly fit the category of resident family member beneficiaries.

Moreover, the policy states that personal property of resident family members is covered, but coverage for the personal property of guests and employees must be requested by the named insured. This certainly suggests no further action is required to obtain family member coverage. I conclude the majority improperly strays outside the four corners of the FAC to add its own factual suppositions about the Talbots' motivating purpose in paying for the policy.

Along the same lines, there is no obligation under California law to repair destroyed property with insurance

proceeds.  (*Burns v. California FAIR Plan Assn.* (2007) 152 Cal.App.4th 646, 650–651.)  Under the majority's reasoning, the Talbots could have recovered on a claim for Wexler's property and then not made Wexler whole for her loss, possibly sparking another law suit, this time intra-family.  In all events, without an insurable interest in Wexler's property, the Talbots had no rightful control over whether and how Wexler sought recompense.

Finally, if the FAC's allegation that the Talbots purchased and paid for this coverage to unnamed resident family members is not sufficient to survive a demurrer on the issue of their "motivating purpose," at the very least, Wexler should be given leave to amend to add facts relevant to the analysis.

As to the third element of the third party beneficiary analysis, the question is whether permitting an action by the third party beneficiary is necessary to effectuate the contract's objective.  (*Goonewardene*, *supra*, 6 Cal.5th at pp. 830, 836.)  Given the Talbot's lack of insurable interest in the damaged property, permitting an action by Wexler is the only way to effectuate the contract's objective.

I conclude this disposition relies on a strained reading of the policy language and is contrary to California's public policy, which holds insurers to their promises.  Accordingly, I dissent.


STRATTON, J.


9